## THE ARIEL.

### Petition of BOAT ARIEL, Inc.

District Court, S. D. New York.

June 17, 1940.

Mahar & Mason, of New York City (Frank C. Mason, of New York City, of counsel), for petitioner.

Haight, Griffin, Deming & Gardner, of New York City (Arthur O. Louis and James M. Estabrook, both of New York City, of counsel), for claimants.

GALSTON, District Judge.

On or about September 21, 1938, a hurricane of great severity struck along the eastern coast of the United States causing extensive loss of life and destruction of property on land and sea. Following the storm the Ariel, which had sailed from New York on September 13th, to fish for sea scallops, failed to return to port, nor were any survivors ever reported from her. It is believed that the vessel and all on board were lost.

The petition, after reciting these facts, alleges that the destruction was not caused or contributed to by any negligence on the part of the Ariel but was due to acts of God and the perils of the sea; and that any damage resulting therefrom occurred without any fault on the part of the petitioner and without its privity or knowledge. Accordingly the petitioner seeks exemption from and limitation of liability pursuant to Secs. 4283, 4284 and 4285 of the Revised Statutes, U.S.C. Title 46, Sec. 183 et seq., 46 U.S.C.A. § 183, et seq.

The answer of the claimants alleges that the Ariel was unseaworthy because her pilot house was improperly fastened to the engine trunk instead of to the deck beams or hull.

Before trial a motion was made by the claimants to dismiss the petition on the ground that it was not filed within the time limited by law. The motion was denied and such disposition I accept as the law of the case.

The proof discloses that on departure from New York the Ariel was supplied with 1417 gallons of diesel fuel, 16 tons of ice, 11 bags of coal, one gallon of valve oil, 800 scallop bags and 1,000 wire tires.

Bedell, an experienced ship builder, had the boat in 1929 in his yard at Stratford, Connecticut, and completed her construction for one Roland, then her owner, working from December 19, 1929 to April 28, 1930. The pilot house was erected on the engine room trunk.

In January, 1937, the petitioner purchased the Ariel from Roland, after she had been inspected at its request by Moore, a qualified surveyor, and after consultation with Jacobsen, her master. Wilkisson, an officer of the petitioner, from then on entrusted the operation of the boat wholly to Jacobsen. The master engaged and discharged members of the crew. The vessel was worked on shares. Greene, employed by the George W. Sunderland Co., ship-builders, last repaired the Ariel in the summer of 1938, and had previously hauled her up every year. In 1937 he had repaired the booby hatch located forward, which had been damaged in heavy weather. In May of 1938, on the after end of the pilot house, three bolts were fastened down below through the sister beam on the main deck, which ran from side to side, and nuts underneath were provided for the bolts. At the same time two bolts were put in at the forward end of the house. These five bolts were installed pursuant to the order of the captain. There was no indication of any wrenching or separating of the house from the trunk. As to the seaworthiness of the pilot house and trunk he said: "I should say there were plenty of bolts. She looked to be as strong as wood and iron could make her." Moore, the adviser of the Middle Atlantic Fisheries Association, found her a heavier vessel than other fishing vessels, particularly as to her deck beams, clamp and seals, bilge stringers, deck-heads, and bolts. The boat was equipped with a radio direction finder and a lux system, and had a radio receiving set.

The first question to be determined is whether there was any negligence on the part of the petitioner or those in charge of the Ariel, for if there was no liability, then, of course, there is nothing to limit. The 84-H, 2 Cir., 296 F. 427; The Suduffco, D.C., 33 F.2d 775; The Yungay, D.C., 58 F.2d 352.

The Ariel was last seen by the boat Mary at either 4:40 P. M. or 5:20 P. M. September 21, 1938. She was then about half a mile north of the Whistling Buoy, which is half a mile north of Nantucket Light Ship. With riding sail set, apparently at that time all was well with her.

The proof concerning the alleged unseaworthiness of the Ariel is not at all satisfactory. The claimants contend that the vessel's pilot house was not securely anchored, that there was a door in the bulkhead between the fish-hold and the engine room which constituted a dangerous condition for the crew, and that the engine room hatch did not have a watertight cover.

It must be remembered that the master and her crew were not strangers to the vessel. Jacobsen and his three sons were with her as early as 1931. In 1934 Jacobsen became her master and remained as such until the time of her loss. During those years two of his sons were on the vessel with him. All of the crew had been on her since May, 1938. It is difficult to believe that as a seasoned mariner, knowing the boat so intimately, Jacobsen would have risked not only his own life but also the lives of his sons and son-in-law to say nothing of the others, unless he knew her to be seaworthy as a fishing vessel. The removal of the pilot house from its setting in the stern of the vessel to the trunk of the engine room was done by Jacobsen and his three sons, assisted by Peter Andreasen,

who was at that time her master. These men were engaged in deep sea fishing for their livelihood and obviously required a seaworthy vessel. The pilot house was, of course, that part most exposed. Failure to correct a leaky seam in the lower side of the engine trunk, as the claimants charge, is difficult to credit, particularly since the vessel was under periodic inspection by Moore and had been in the shipyards for repair and overhauling on periodic occasions. Why Captain Jacobsen and his predecessor, Captain Andreasen, should have permitted an alleged dangerous condition of the seams to remain for years without repair is not explained. I find the testimony of Andreasen about the pilot house fastenings unconvincing. The vessel, including her house stood up even during the heavy storm which she rode in December, 1935, and which damaged only her booby hatch forward. She was overhauled as late as May, 1938. The conclusion is forced that if the Ariel's pilot house was carried away on the day of the loss of the vessel, it was not by a moderate sea outside the hurricane area.

Nor does the proof of a door in the bulkhead between the fish-hold and the engine room establish an unseaworthy condition. At any rate there is no proof to connect that condition with the loss. Likewise the proof in respect to the wooden grating covering the engine room hatch is no reason for believing that an unseaworthy condition existed. Then too Moore said that in addition to the wooden grating there was a steel cover on hinges.

On the whole the weather conditions prevailing on September 21 afford a most reasonable explanation of the loss of this vessel. In the report of the United States Department of Agriculture, there is a reference to storm driven waves overflowing great portions of the shore wall by the heads of Narragansett and Buzzard Bays. Twenty-six hundred boats were destroyed in the hurricane. The report states: "There has never been a storm of such high speed migration since precision instrumental observations have been possible, nor has one maintained its intensity of gradient and such high speed in combination." The daily local record of the Weather Bureau of the United States Department of Agriculture, from the Nantucket station on September 21, 1938, contains this note: "Unusually high tides and heavy swell did considerable damage to ocean side of is-

land, breaking through into ponds, but did no material damage to buildings. Night boat did not return. * * * Southeast storm warning message received 10:30 A. M. Wind velocity in the afternoon of September 21st in the region of Nantucket was exceedingly high."

Sigurd Jacobsen and Andreasen last saw the Ariel 52 miles east by north of the Nantucket Light Ship at 9 A. M. on the morning of September 21, 1938. Their radio set reported two storm warnings, one at 8 o'clock in the morning. In hailing the Ariel Sigurd Jacobsen spoke to his father about the storm warnings.

Olsen, an independent witness, saw the vessel later that day, either at 20 minutes to 5 or 20 after 5 in the afternoon, in a position to the northward of the Nantucket Whistle. He observed nothing wrong with the boat in passing. At that time she was drifting with her engines stopped. Consequently there is left only speculation as to the cause of her loss. At Nantucket Light Vessel the wind was blowing from the southwest at that time with gale force and at 6 P. M. the dory of the Light Vessel was crushed in by a heavy sea. At 8:50 P. M. the tide was high at Nantucket shoals.

In the probabilities of the case, the hurricane which destroyed so many other vessels most likely also engulfed the Ariel; and she may well have been battered in the shoals of Nantucket. Leastways no other explanation can be accepted.

Finally it must be observed that the loss occurred without the petitioner's privity or knowledge of seaworthiness. The actual operation of the boat, including the engagement of her crew was in the hands of Captain Jacobsen. The overhauling and construction work were in the hands of Captain Jacobsen. Captain Jacobsen was recognized as a competent master. Wilkisson knew nothing about the handling of fishing boats. He was neither a seaman nor a boatman. He had nothing to do with the inspection of the boat. His function seems to have been to sell the fish caught. He relied on an expert when the vessel was purchased and on the same expert, Moore, for inspection thereafter. The repair and supply bills put in evidence covering a period from March 1937 to September 1938 show an outlay of thousands of dollars. If an unseaworthy condition existed in September, 1938—and of that I find no preponderating evidence—Wilkisson is not shown

to have had actual knowledge of or been privity to any such condition. In such circumstances the petitioner is entitled to limitation. The Republic, 2 Cir., 61 F. 109. Certainly the unseaworthiness of the vessel, alleged to stem from the condition of pilot house or bulkhead door, was not so obvious as to meet the eye of Wilkisson on his occasional visits to the vessel at the dock. Therefore, In re New York Dock Co., 2 Cir., 61 F.2d 777; Christopher v. Grueby, 1 Cir., 40 F.2d 8; and In re Great Lakes Transit Corporation, 6 Cir., 81 F.2d 441, relied upon by the claimants, are not applicable.

In accordance with the foregoing the petition is sustained and the petitioner may have a decree of exoneration from liability.