Jacob JOHANNESEN, Libelant,

v.

The UNITED STATES of America, Respondent,

and

S. J. Farrington Iron Works, Inc., Respondent-Impleaded,

and

Marine Rigging Works, Inc., Second Respondent-Impleaded.

No. 19453.

United States District Court E. D. New York.

Jan. 9, 1956.

Edward H. Levine, and Vernon C. Rossner, New York City, for libelant.

Leonard P. Moore, U. S. Atty., Brooklyn, N. Y., by Martin J. Norris, and Howard F. Fanning, New York City, Advocates, for respondent, United States.

Galli & Locker, by Patrick J. McCann, New York City, Advocate, for S. J. Farrington Iron Works, Inc.

Arthur V. Lynch, by Harold F. Cumisky, Jr., New York City, Advocate, Purdy, Lamb & Catoggio, New York City, of counsel, for Marine Rigging Works, Inc.

BYERS, District Judge.

The libelant was injured while working aboard the U. S. A. Transport George W. Goethals, on October 10, 1949 at about 4:30 P. M. He received statutory compensation through March 1950, and medical expenses. He then instituted this cause which is under the Public Vessels Act, 46 U.S.C.A. § 781 et seq.

He was struck by the reverse action of a handle which was being turned by two other men and himself, after its engagement with the shaft of a winch, in order to create slack in the falls thereof, namely, so that lifeboat No. 2 port side, which was waterborne alongside the ship, might be made fast to the falls, preparatory to being hoisted to the boat deck.

The libelant's cause is not that the winch failed to function, but that it did. Thus there was no defect involved in the mechanism of the winch; it was structurally sound, but because it was capable of misuse by the man in control of its operation, the libelant urges that the ship was unseaworthy.

Attention is thus at once directed to the winch as an element of the ship's construction. This calls for an analysis of the testimony as to the applicable standards at the date in question, with a view to ascertaining whether the respondent adhered to, or departed therefrom, to the detriment of libelant.

The circumstances attending his injury are not in dispute, so that detailed findings in that respect are not required.

The ship lay starboard side to pier 11, Staten Island, and underwent annual Coast Guard inspection between October 7 and October 17, 1949.

Voyage repairs and general work were performed under contract with the S. J. Farrington Iron Works, which sublet the job of testing the life boats to Marine Rigging Works, Inc. The presence of these impleaded respondents is thus explained.

Libelant Johannesen was in the employ of Marine, and had been assigned to work on the Goethals on the morning of October 10, and started his labors about 1:00 P. M. He was one of a gang of seven experienced ship riggers of which the foreman was Arne Abrahamsen, and at that hour the work of testing the life boats was started. There were five on each side of the ship and this cause does not involve those on the starboard side, as to which the tests were accomplished without incident.

Concerning the port side life-boats, some details should be stated: the procedure as explained involved the lowering of each life-boat in turn. As it became waterborne it received a load of sand bags from a barge some 20 to 25 feet from the ship's side, to simulate occupancy to the extent of capacity; then it was hauled back to a position under the davits, the falls were affixed, and the boat was raised by operation of the winch at each station; then the boat was lowered, the bags were removed to the deck of the barge, and the life-boat was

hauled back light, for final raising and nesting in its cradle on the boat deck.

This procedure was departed from on the port side in that but one boat was actually loaded and raised by the davits to test the latter, i. e., their capacity to raise a loaded boat.

The one employed was the Number 2; as to each of the others, 4, 6, 8 and 10, they were lowered and raised light, Number 2 alone being used as the laden unit, at stations 4, 6, 8 and 10. Thus the davits at each of these stations were tested with a loaded boat, in the same way as though the latter numbered boats had been successively loaded and raised. This departure from customary procedure was without effect so far as libelant was concerned, and is found to have played no part in his injury.

It was the attempt to raise the Number 2 when light,' at the completion of these tests, that gave rise to the libelant's cause. That boat was brought into position under the davit at the Number 2 station, but it became apparent that the falls were not long enough to enable the two men who were riding the boat to make the blocks fast in the fore and aft position; thus it became necessary to lengthen the falls, and it was at this juncture that the misadventure occurred, in the functioning of the winch.

These life boats were of steel construction, and their lowering, after the davits had swung each one out from its cradle, was accomplished by gravity alone. It was hoisting the boats only which enlisted the power element in a given davit, namely electric current which activated a motor to turn the shaft by which the hoisting was accomplished.

Current flowed in response to the control of a shut-off switch placed on the bulkhead adjacent to the davit. That switch was operated by a handle which plainly showed whether it was in the "on" or "off" position to indicate the presence or absence of current (supplied from the engineroom) to the motor of the winch. The current however could not be applied until a button switch near the port rail near the davit should be pressed.

When that was done, the current caused the motor to turn the shaft to raise the falls.

The button switch was pressed on this occasion by Abrahamsen, the foreman of the gang of which libelant was a member, thus activating the hoisting gear, at a time when the three men on deck were manually lowering the falls to pay them out, as has been stated. This caused the handle which they were rotating, to kick back, striking Johannesen on the body, knocking him to the deck and causing bruises and a brain concussion.

The testimony of Abrahamsen is quoted:

"Q. When you say you put the switch on, just what did you do? A. I went over to the box and pulled the handle down.

"Q. Is that the switch box opposite to the No. 2 lifeboat on the bulkhead? A. Yes.

"Q. You put that on? A. Yes.

"Q. What did you do? A. I went to a little switch on the outside.

"Q. Between the rail and the winch? A. Yes, the one that controlled the winch.

"Q. Did anything happen at that moment? A. At that moment, one of the blocks, they hadn't hooked more than one.

"Q. When you say the blocks, where are these blocks? A. They are hooked on to the releasing gear of the boat.

"Q. One of the blocks hadn't been hooked on? A. Yes, and one missed, and they had to pull the boat back.

"Q. What happened then? A. Then somebody hollered for more slack, and that is where they went back and took the crank.

"Q. Where were you at that time? A. By the switch, and I never turned around. They didn't

have any business calling for anything.

"Q. Where were you facing, looking at that time? A. Down in the boat.

"Q. Did you see the men go for the crank handle? A. No.

"Q. What did you do after that? A. I had to wait for 20 or 30 seconds, that was all it took.

"Q. For what? A. To get the boat hooked on. We had plenty of slack only it drifted away a little. The boat was hooked on, I pushed the switch and it come up just as something dropped on the other side. I went around to look and see what happened.

"Q. When you pushed the switch on the winch, speaking now of the switch near the rail, did anything happen so far as the winch is concerned? A. It made a couple of turns.

"Q. Did the current go on the winch at the time the winch was started up? A. Yes, it started.

"Q. Did it lift the boat up? A. No, I didn't start that up."

Thus it is shown without contradiction that the foreman of this gang of riggers, knowing that the lowering operation was under way, i. e., the crank was rotating the shaft so as to pay out the falls, and without turning around to observe the men so employed, operated the switch setting up the reverse movement of the handle. This was not the action of the ship, or anyone at all but a fellow employee of the libelant. It is so found.

As to the winch itself, the evidence is convincing that it was of the standard and approved construction at the date in question. The testimony of Carroll, the Chief Engineer of the Welin Company, Davit and Boat Division, is persuasive and uncontradicted. It requires no recapitulation.

The libelant's argument rests upon Carroll's statement that at the end of World War II, his company provided an electrical winch for use on combat vessels of the Navy which he thus described:

"During the latter part of World War Two we manufactured winches for the Navy which had an electrical interlock, hand crank interlocks on them. That was electrically operated. However, this particular device was not sanctioned by the United States Coast Guard. It was merely a Navy item.

"Q. All right, now what was the function of that safety device that the Navy sanctioned and the Coast Guard didn't? A. Well, this particular switch was an electrical switch which had normally closed contactors, and they were mounted on either end of the worm shaft of the winch, and when the switch was open—and on the end of the switch was a bar stop which covered the square shank of the worm shaft. When they were open and against the square shank of the shaft, that would render the electrical circuit in operation and the motor could be operated. However, when those were opened to put a crank on it broke the circuit and no electrical current could be supplied to the motor."

This means that the operator of such a handle as the libelant and his mates were turning, would not be subject to the reverse action here revealed, because the insertion of the handle would break the current if it had been turned on by the control or cut-off switch.

His further uncontradicted testimony is that such a device was not on the market on October 10, 1949 and that:

"Q. And if anybody else wanted to buy it at that time I suppose you wouldn't have had any objection to selling it to them, would you? A. It could not be used on any merchant vessels because the United States Coast Guard regulations, which regulate United States Merchant Marine passenger carrying vessels did

not allow this particular mechanism, this particular electrical interlock, to be used."

The witness had already testified that just prior to December 15, 1949 a throw-out or disengaging device had been designed (U.S.Ex. 6) which was approved of by the Coast Guard on December 15, 1949. This device he explained thus:

"The Witness: J-a-w, your Honor —a jaw arrangement which is fastened to the winch worm shaft end. Mating with this is another jaw arrangement which is fastened to the crank handle, and the jaw will only engage when hoisting is desired. That is, manually. However, if electrical current is applied to the motor of the winch the jaw of the hand crank will become disengaged immediately from the winch proper. That is the function of the automatic throw-out device."

Contrasting these two devices, Carroll's testimony was:

"Q. Was this electrical device that was employed by the Navy similar to the one that you call now the automatic safety device? A. No, it was not."

The effect of the foregoing, which is undisputed is to demonstrate that on October 10, 1949 the Goethals was equipped with electrically operated winches that were standard and of the type and kind which had been approved of by the U. S. Coast Guard. It is not argued that the latter agency of Government did not possess the function of prescribing such equipment for merchant vessels.

However desirable it might have been at the critical date that the ship should have been equipped with a life-boat winch that even a blundering and careless foreman could not have so operated as to cause this injury, it does not follow that the Goethals was unseaworthy because of the absence of a foolproof life boat hoisting mechanism.

The uncontradicted testimony of Commander Axelson of the Coast Guard who was present on the Goethals on October 10, 1949 is that the throw-out device was approved by the Coast Guard in August of 1951, effective July 1952, as to vessels then in commission which lacked such equipment on the first named date.

The testimony of the libelant's expert Finkenaur has not been overlooked, but it comes down merely to the statement that this hoisting device became dangerous because Abrahamsen chose to make it so. If he had used it properly after instructing Johannesen and his mates to disengage the handle, there would have been no reverse action of the latter.

The finding is that the Goethals has not been shown to have been unseaworthy on October 10, 1949, as to the hoisting winch at the station of life-boat No. 2 on the port side of the ship.

It is further found that such winch was reasonably fit for its intended use on October 10, 1949 and that the ship as so equipped was a reasonably safe place as to the boat deck, for men to work in testing the life-boats.

These findings are thought to be in harmony with the following cases: Doucette v. Vincent, 1 Cir., 194 F.2d 834, at page 837; Berti v. Compagnie, etc., 2 Cir., 213 F.2d 397, at page 400; Manhat v. U. S., 2 Cir., 220 F.2d 143, at page 148.

Contentions concerning the happening on the "Marine Carp" in 1947, and the substitution of a wheel for the handle here used, have been examined in connection with the testimony of both Craft (libelant's witness) and Carroll. The winch at station No. 2 port side of the Goethals is not thereby discredited as standard equipment on October 10, 1949.

I do not reach the question of contributory negligence, namely the stencilled admonition appearing on the side of the winch adjacent to the shaft to which the handle was affixed, and the knowledge of experienced riggers to the effect that the handle should not be inserted when the current was on, which was obvious from the position of the handle of the cut-off switch, because the libelant was entitled to look to his fore-

man Abrahamsen for directions in the performance of his own tasks.

Since the libelant has not succeeded in showing that the Goethals was unseaworthy, he has not established a primary liability for which either respondent impleaded could be held to have indemnified the respondent; hence the impleading petitions are dismissed.

Decree for respondent on the merits, to be settled on notice.