Julio Santell **RODRIGUEZ**, Libelant,

v.

**THE ANGELINA,** her boilers, engines, etc., and **A. H. Bull Steamship Co.,** Respondents.

No. 88.

United States District Court
D. Puerto Rico,
San Juan Division.

April 24, 1959.

Goldenbock & Nachman, Stanley L. Feldstein, San Juan, P. R., for libellant.

Hartzell, Fernandez & Novas, San Juan, P. R., for respondents.

RUIZ-NAZARIO, District Judge.

This is a suit in admiralty instituted by Julio Santell Rodriguez, a longshoreman, against the S.S. Angelina and her owner A. H. Bull Steamship Co. to recover damages for personal injuries received while the libelant was working

aboard the named vessel stowing raw sugar. It is alleged that the injuries were caused by the defective condition of the winch, unseaworthy condition of the vessel and by the fault and negligence of the master, officers, and crew of the vessel in failing to provide libelant with a safe place in which to work, and in failing to maintain and operate the vessel in such a manner as to avoid the occurrence of the accident, and in failing to warn libelant of the dangerous condition of the vessel.

Libelant went aboard the S.S. Angelina on April 11, 1953, at about 7:00 A.M. The Angelina was anchored in the open port of Arroyo, P. R. Together with the other members of his gang he started working in No. 5 Hold of the ship loading raw sugar in the forward half of the hold. Only a portion of the hold, the forward part, was being loaded. The other part was empty. As the bags of raw sugar were stacked, the stow rose forming an almost vertical wall of bags extending athwartship across the hold. The 250 lb. bags of sugar came aboard the ship in sling loads of eight bags each from launches alongside. The sling loads came down into the center of the hold and were then swung by four men to the area where the bags were to be stacked. The tiers of bags were interlocked.

By about 2:30 or 3:00 P.M. the stack of bags was approximately 20 feet high, the sling load coming down very close to the edge or precipice. When libelant and his fellow workers were moving a sling load, he lost his balance and stepped off into the air, falling 20 feet to the iron plates below.

Libelant's theory of the case is based on several circumstances which it is contended in combination made the vessel unseaworthy and its officers negligent by reason of their failure to do certain things. These factors in this accident are the following:

1. The after draft of the vessel was 3 feet 10 inches more than the forward draft, causing the surface of the stow where libelant was working to be inclined instead of level, causing him to lose his balance.

2. The men were being paid on a piece work basis, causing a dangerous speed up with disregard for the men's own safety.

3. The vessel was moving.

4. No officer was present at the time of the spotting of the booms.

5. No safety net was provided.

As stated in Ross v. Steamship Zeeland, 4 Cir., 240 F.2d 820, at page 822: "The crucial consideration is whether the ship was, in all respects pertinent to the injury, reasonably fit to permit libellant to perform his task aboard the ship with reasonable safety," citing Lester v. United States, 2 Cir., 234 F.2d 625, 628.

The ship was lower aft than it was forward, some 3 feet 10 inches, and sugar bags when stacked do not provide an even surface; however, the difference in draft made such a slight inclination in a vessel 400 feet long as to be insignificant, and the place of work thus furnished cannot be said to be unsafe, nor can I hold that the vessel was unseaworthy by reason of this circumstance. The place was reasonably fit to permit libelant to perform his task aboard the ship with reasonable safety.

The fact that the libelant and his fellows were being paid on a piece rate basis does not impress me. To begin with the respondent had nothing to do with the collective bargaining contract between libelant's union and the stevedoring contractor. Nor has any evidence been adduced to show that the system of rates payable for the work on this occasion was any different from the standard system in the Puerto Rican sugar trade so as to require the respondents to set up special or unknown procedures to protect the longshoremen from their natural desire to load an excessive number of pieces per hour.

The point is made that the place of work was unsafe or the ship unseaworthy in the absence of special devices,

or in combination with their absence and the slight inclination toward the stern by reason of the ship's motion in the open harbor of Arroyo. While it is obvious that any ship anchored in an open harbor will undergo some motion, the log shows that the wind was a Force 4, meaning 11 to 16 knots or 13 to 18 M.P.H. Captain Crocco, who is familiar with the port of Arroyo, testified that this would not make a ship such as the Angelina, at anchor, roll or pitch.

Although the deck log shows that a mate signed the log every four hours, and it is inconceivable that at any period of time such a vessel anchored in an open port was without any officer on some part of the ship, I must conclude from the testimony that no officer was present precisely at No. 5 Hatch when the booms were spotted. I must also find that no order was given to re-spot the boom as a result of the increasing stature of the stow of sugar bags in Lower Hold No. 5.

■ Much has been made of this by proctors for libelant, and the question has been raised whether the independent stevedoring contractors' control of this operation relieved the respondents from liability. I am not sure that the fundamental reasoning of Lopez v. American-Hawaiian Steamship Co., 3 Cir., 201 F. 2d 418, in favor of the shipowner, in connection with an injury to a longshoreman while working in a part of a ship under the control of the stevedoring contractor rather than the shipowner is obsolete [1] as a result of Alaska Steamship Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 410; in the Alaska Steamship case, as in Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 and Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143, there was always present some actual material defect in the gear either belonging to the ship, or allowed to be on it; thus the defective device or part of the ship could be, although snugly fitted into the immemorial definition of unseaworthiness as being a defect in the ship's hull, gear or stowage and the shipowner held liable despite surrender of control to an independent stevedoring contractor; libelant here, however, abandoned his theory of a defective winch and instead relies on a congeries of unfavorable circumstances such as wind force, draft of vessel, nature of sugar bags, height of stow, and failure to re-spot the boom, to show unseaworthiness, an unsafe place of work, and negligence. Under the testimony, however, it is unnecessary to consider the question of who was in control of the boom. While the testimony is to the effect that it is *safer* to re-spot the boom as a stow increases in height, there is nothing to show that the failure to do so in this case was the proximate cause of libelant's fall.

■ Finally, we come to the question of whether the ship was unseaworthy, or the respondents negligent, or whether the place of work was unsafe, by reason of the failure to provide certain safety nets. With due respect to libelant's expert Captain Ash, I am unable to see how such a net could be rigged beside an ever increasing stow and safeguard men on the stow from falls and at the same time not interfere with the loading operation. It should be borne in mind that it was not a question of covering an open hatch to prevent men falling from one deck to another, as in Grillea v. United States, 2 Cir., 232 F.2d 919, and the Alaska Steamship case, supra. The net suggested by Captain Ash would have to be in some manner rigged so as to be stretched across the width of the entire stow and in this fashion would allegedly prevent men from falling from the stow to the deck the stow was on, not a lower deck. Two witnesses, Ramón Ortiz Muriel, a witness for libelant, and Captain Crocco, as respondents' expert, both long familiar with sugar load-

---

1. In this connection see page 401 of 347 U.S., page 604 of 74 S.Ct., second paragraph, of the dissenting and only opinion in the Alaska Steamship case, infra, where the distinction made by Lopez v. American-Hawaiian S.S. Co., supra, is the subject of comment. by Mr. Justice Burton.

ing operations in Puerto Rico, testified that they had never seen such nets.

 "Nor is perfection required of shipowners by the maritime law of seaworthiness for generally stated it is the shipowner's duty under that law to provide a vessel sufficient, that is, reasonably adequate, in materials, construction, equipment, stores, officers, men and outfit for the trade or service in which the vessel is employed." Doucette v. Vincent, 1 Cir., 194 F.2d 834, 837. That case is also authority for the proposition that no negligence is shown by the ship's failure to provide "best" or "safest" devices.

For the reasons stated, the libel must be dismissed. Proctors for respondents are directed to prepare proposed findings of fact and conclusions of law, and a decree, with notice to proctors for libelant, within 15 days from the date of this opinion.