In re Arthur E. HARRIS, d/b/a Arthur Harris Marine Towing Petitioning for Exoneration from, or Limitation of, Liability.

No. 3461, Division D.

United States District Court
E. D. Louisiana,
New Orleans Division.
March 29, 1963.

Deutsch, Kerrigan & Stiles, Paul A. Gaudet, Cornelius G. Van Dalen, New Orleans, La., for petitioner.

Talley, Anthony & Hughes, John W. Anthony, Bogalusa, La., Lemle & Kelleher, N. B. Barkley, Jr., George B. Matthews, Montgomery, Barnett, Brown & Read, John P. Hammond, Kierr & Gainsburgh, Samuel C. Gainsburgh, New Orleans, La., for claimants.

Adams & Reese, Richard C. Baldwin, New Orleans, La., trustee.

AINSWORTH, District Judge.

The tug RALPH E. HAVENS sank in the Gulf of Mexico during heavy gales. Two of the four crew members died in the catastrophe. The owner of the tug petitions this court for an exoneration from, or limitation of, liability, pursuant to General Admiralty Rules 51–54 and 46 U.S.C. §§ 183–189. One of the survivors and the heirs of two other deceased crewmen filed claims and answers herein opposing the petition. The court finds that the tug RALPH E. HAVENS sank as a result of a severe and unexpected storm. Exoneration is therefore granted.

Exoneration from liability is allowed when the loss is not caused by unseaworthiness or negligence. Specifically, acts of God and perils of the sea do not render a shipowner liable for losses resulting therefrom. See 46 U.S.C. § 192; The Ariel, S.D.N.Y., 1940, 33 F.

Supp. 573, aff'd 2 Cir., 1941, 119 F.2d 866.

Trial of the issue of liability only was held and the following facts were elicited.

In the late afternoon of December 8, 1957, the HAVENS was proceeding without tow up the western side of the Florida peninsula. Its destination was the entry point of the eastern end of the Gulf Inland Waterway at Carrabelle, Florida. It is necessary when coming from Virginia to Louisiana, the original route of the HAVENS, to follow the west coast of Florida up to Seahorse Whistle Buoy and then cross approximately 90 miles of open Gulf to Carrabelle. It was in this open stretch of Gulf that the HAVENS encountered the storm that sank her.

About two hours after leaving Seahorse Whistle Buoy the HAVENS received a weather report forecasting "fresh" northwesterly winds for later that night or early the next day. At the time the captain of the HAVENS received this report there was a moderate southwesterly wind and the sea was smooth. The captain, who had made this crossing on ten or twelve previous occasions, decided that it was safe to proceed. In view of the weather reports and the captain's experience, we cannot say that this was a negligent decision. Undoubtedly if the captain knew then what he later knew, he would have turned back; however, decisions of navigation have to be made on the basis of information available at the moment. Subsequent unexpected events do not render a past decision negligent, if that past decision was prudent in the light of facts known at the time.

■■ A tug captain is charged with knowledge of storm warnings posted by the Weather Bureau, The Gold Rule, 1925 A.M.C. 297, aff'd 2 Cir., 1922, 278 F. 1021, but here the official weather report was "fresh" northwesterly winds, 17 to 21 knots, which in the captain's discretion properly allowed him to proceed. See The Fred Smartley, Jr., 4 Cir., 1939, 100 F.2d 971.

At 1:30 a. m. on December 9 the captain was awakened by the vessel's "jumping and lunging." In order to keep the vessel from "diving" he slowed the engine. The weather worsened rapidly. The captain slowed the HAVENS further. She lost most of her steerageway. Her bow fell off to starboard. A sea struck her port bow. She broached and wallowed in the trough of the seas. Speed was increased but before she could be headed two large waves piled over the port side breaking out the windows of the deckhouse.

The HAVENS took in dangerous quantities of water through the broken windows. A distress signal was sent out, but was not answered. The lifeboat was readied for launching, but the captain stayed at the wheel until the HAVENS' "waist" was nearly awash. He stopped the engine and joined the three crewmen at the lifeboat. At the captain's instructions the men waited until the water reached their feet, then jumped into the lifeboat, but as they jumped the HAVENS sank and the afterdavit swung out, caught the gunwale of the lifeboat and capsized it.

It was now three o'clock in the morning. After about an hour in the water the crew succeeded in righting and bailing the boat. It was then discovered that all of the supplies and equipment, except the row locks and three oars, had been lost in the capsizing.

After three and a half days of exposure in cold, heavy winds and rough seas the lifeboat was brought to shore near Bayport, Florida. Two crewmen had died. The surviving captain and crewman were hospitalized and treated for exposure.

■ Petitioner's claim for exoneration is based upon the contention that the sole proximate cause of the sinking of the tug RALPH E. HAVENS was the unforecasted violence of the gale encountered by the HAVENS. It is true that when a storm is relied upon to explain the sinking of a vessel the storm must be shown to have been of extraordinary intensity. Sabine Towing Co. v. Bren-

nan, 5 Cir., 1934, 72 F.2d 490, 493. However, what constitutes "extraordinary intensity" is a relative matter. The Supreme Court pointed out in Compania de Navegacion Interior, S. A., v. Fireman's Fund Ins. Co., 1928, 277 U.S. 66, 48 S. Ct. 459, 72 L.Ed. 787, that a large ocean-going vessel encountering what to it would be a light breeze could well be an exceedingly dangerous gale to a small, inland, wooden tug. Here we had a small, inland, wooden tug that encountered waves of 12 to 13 feet, which must surely constitute a storm of "extraordinary intensity" to such a vessel.

■ Claimants' contention that the HAVENS was unseaworthy due to her age and condition is not borne out by the evidence. Although she was 52 years old at the time of her sinking, she had an excellent inspection and maintenance record. An experienced marine surveyor who had personally examined the HAVENS on three different occasions in 1956 testified that she was in a sound and seaworthy condition. Claimants' countering evidence was of an abstract nature concerning the general effect of age on wooden vessels. Age alone does not establish unseaworthiness; it is but one factor to consider.[1]

Was the HAVENS improperly equipped? No, for the following three reasons:

(1) She had four bilge pumps as follows: (a) A 1-inch centrifugal pump which operated off the flywheel of the main engine had been installed only five days before the sinking. This pump had been tested and was working properly before the storm. (b) A 2-inch fire and bilge pump which was operated by a 10 h. p. auxiliary diesel engine. (c) A 1½-inch gasoline powered pump which had been permanently installed on a rack aft of the deckhouse and provided with a canvas cover. (d) A 2-inch portable gasoline pump with a flexible suction and discharge hose which could be moved about and used anywhere. During the trip down from Virginia, petitioner, as an added precaution, had the protable pump moved into the engine room where it would be kept dry and would be available in case of emergency.

(2) The location of the bilge pumps' suction strainers did not render the vessel unseaworthy and the bilges were not unusually dirty. There is no dispute that the strainers were located in such a way that they could not be cleaned while the drive shaft was revolving. However, the bilges were, according to the testimony, reasonably clean and routinely inspected for cleanliness. The fact that the drive shaft had to be stopped is not per se negligence, for this type of maintenance is usually performed in the safety of a harbor.

It was unconvincingly contended by claimants that the bilge strainer was made up of ordinary household mosquito screening. If proven, this could be unseaworthiness since the strainer would probably become clogged whenever heavy seas were encountered and thus necessitate stopping the engine. However, we conclude from the testimony that the bilge strainer was not constructed of household mosquito screening and that the bilges were not filled with muck and debris; therefore, the location of the bilge pumps' suction strainer did not cause the HAVENS to be unseaworthy.

(3) The window panes were of a type standard on such vessels as the HAVENS. Two marine surveyors testified that the windows on the HAVENS were of the type found on over ninety per cent of similar vessels.

It is undoubtedly true that if those window panes had been of a stronger type, they would not have broken. The HAVENS would have shipped less water when she broached, would have been less "loggy" and possibly might not have sunk. This "for want of a nail" argument does not establish unseaworthiness, however.

■ An owner is not required to equip his tug with the latest devices conceivable, but only such as are reasonably

---

1. Compare Petition of Cherokee Trawler Corporation, E.D.Va., 1957, 157 F.Supp. 414, 418.

required for the vessel's purpose. The standard of reasonableness will be influenced by comparison with similar vessels.[2]

■ Claimants' contention that the captain was negligent in slowing the HAVENS, thereby causing her to broach, was not proven. The captain admittedly slowed the HAVENS. His purpose was to keep her from "diving" in the heavy seas. It is well recognized that it is good seamanship to slow down a small vessel as much as possible when proceeding in heavy seas, keeping only enough steerageway to prevent broaching. As the speed decreases, the possibility of broaching increases. This is a judgment that the captain in such a circumstance must make. A mistake in judgment when viewed from the vantage point afforded by hindsight is not to be imputed as a fault.[3]

■ At the trial, claimants objected to the admissibility of the deposition of the HAVENS' captain, WICKIZER, on the ground that claimants were not allowed access to a written statement given by the captain to the petitioner. The deposition was taken after due notice more than six months after the accident and more than four years prior to trial. Claimants were given and exercised full opportunity of cross-examination. See Hoffman v. Chesapeake & O. Ry. Co., N.D.Ohio, 1947, 7 F.R.D. 574, 575. No showing of "special circumstances" or "good cause" for the production of the statement was made. Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947).

■ There is an important distinction between calling for a statement at a deposition and calling for a statement at a trial during cross-examination. After an adverse witness has testified at the trial, opposing counsel, in order to effectively cross-examine, may be entitled to see and use previous statements of the witness.[4] However, the court, upon motion of the claimants, has examined the previous statement of the witness, WICKIZER, and finds that the witness' statement is substantially the same as his testimony on deposition. The statement is herewith placed in evidence by the court. The objection to the admissibility of the deposition of the witness, WICKIZER, is denied.

■ The final matter for consideration is the additional claim of the survivors of the deceased seaman for injuries sustained when he was launching the lifeboat. The court has thoroughly explored the testimony and finds that the evidence indicates a great deal of confusion and expected excitement in the launching and ultimate capsizing of the lifeboat, but no negligence or unseaworthiness.

For the foregoing reasons the petition for exoneration of liability is Granted.

2. Compare Pinion v. Mississippi Shipping Company, E.D.La., 1957, 156 F.Supp. 652; The New York, 2 Cir., 1913, 204 F. 764; Doucette v. Vincent, 1 Cir., 1952, 194 F.2d 834; Johannesen v. United States, E.D.N.Y., 1956, 136 F.Supp. 786; Rodriguez v. The Angelina, D.C. P.R., 1959, 177 F.Supp. 242; and Fox v. The SS Moremacwind, E.D.Va., 1960, 182 F.Supp. 7, aff'd 4 Cir., 1960, 285 F.2d 222.

3. The Mary T. Tracy, S.D.N.Y., 1920, 298 F. 528, 530; The Imoan, 2 Cir., 1933, 67 F.2d 603, 605; The Fred Smartley, Jr.,

4 Cir., 1939, 100 F.2d 971, 974; Green v. Crow, 5 Cir., 1957, 243 F.2d 401, 403, " * * * an honest error in judgment by the navigator is not to be imputed as a fault * * * "; Boudoin v. J. Ray McDermott & Company, 5 Cir., 1960, 281 F.2d 81, 84; and Maroceano Compania Nav. S. A. of Pan. v. City of Los Angeles, S.D.Cal., 1961, 193 F.Supp. 529, 532.

4. Claimants rely upon United States v. Matles, E.D.N.Y., 1957, 154 F.Supp. 574, which is based upon the Jencks rule and not applicable here in this suit between private parties.