Complaint of **ALLIED TOWING CORPORATION, as Owner of the TANK-BARGE ATC 3060 for exoneration from or limitation of liability.**

Civ. A. No. 75–151–N.

United States District Court,
E. D. Virginia,
Norfolk Division.

Feb. 5, 1976.

As Amended March 9, 1976.

Morton H. Clark, of Vandeventer, Black, Meredith & Martin, Norfolk, Va., for plaintiff.

Sidney H. Kelsey, Arthur C. Ermlich, Ralph Rabinowitz, Alan P. Owens, Gerard P. Rowe, R. Arthur Jett, Jr., C. Arthur Rutter, Jr., Kanter & Kanter, Seawell, McCoy, Dalton, Hughes, Gore & Timms, Norfolk, Va., for claimants.

## MEMORANDUM OPINION AND ORDER

CLARKE, District Judge.

Allied Towing Corporation [hereinafter referred to as "Allied"] seeks exoneration from or limitation of liability in regard to damages caused by an explosion and subsequent fire aboard the tank barge ATC 3060 on March, 17, 1975. Exoneration from or limitation of liability is sought pursuant to 46 U.S.C. § 181,

*et seq.* Allied is entitled to exoneration if it is free of liability. If negligence is established, Allied argues that damages for which it would be liable should be limited to the barge's value and its pending cargo pursuant to the statute.[1] Jurisdiction is invoked pursuant to the Court's general admiralty jurisdiction, 28 U.S.C. § 1333 and the specific grant of jurisdiction to supervise limitation of liability proceedings.

Allied has complied with the statutory requirements detailed in 46 U.S.C. § 181, *et seq.* and the provisions of Rule F, Supplemental Rules for Certain Admiralty and Maritime Claims, Federal Rules of Civil Procedure. Allied fulfilled the notice requirements informing all potential claimants that Allied was seeking exoneration from or limitation of liability. The parties opposing Allied's invocation of limitation of liability are persons whose property or person were injured by the explosion and fire aboard ATC 3060. Parties were provided an opportunity to present evidence and brief the relevant issues.

## FINDINGS OF FACT

Most of the facts are not in dispute. Allied Towing Corporation is a wholly owned subsidiary of Allied Marine Industries, Inc.[2] William E. Law is president of both Allied Marine Industries, Inc. and Allied Towing Corporation. Similarly, he is a director and stockholder of both corporations. Allied's corporate headquarters are located at Norfolk, Virginia, as is its principal place of business. Both are located in close proximity to the banks of the Eastern Branch of the Elizabeth River on Avory Avenue in Norfolk, Virginia.

Allied is the owner of the barge ATC 3060 which was moored at the corporation's docks on March 17, 1975. ATC 3060 is designed to carry fuel oils and is an unmanned barge built in 1968 and had been owned by Allied since 1972. ATC 3060 was docked for the purposes of investigating for and if necessary, repairing a suspected leak in one of its tanks. The history of the leak is pertinent to this limitation proceeding.

On March 15, 1975, an Allied tug towing ATC 3060 was directed by Joe Smith, Vice President of Operations, to meet the tanker AMOCO Yorktown and to lighten a cargo of Grade C crude oil from the ship to a dock on the York River. Chemical tests by Amoco confirmed that the AMOCO Yorktown was carrying Grade C and that the oil delivered was Grade C. This cargo was discharged from the barge at the AMOCO Yorktown refinery on Sunday, March 16, 1975. In the process of discharging, an oil slick formed near the ATC 3060 and it was suspected that it was caused by a leak in one of the barge's fuel compartments. The tankerman in charge of the barge contacted Mr. Wayne Johnson, Allied's Vice President of Maintenance and Repairs, on Sunday, March 16, 1975. Mr. Johnson was advised that the ATC 3060 had a suspected leak and the barge was ordered to return to Allied's yards for inspection and if necessary, for repairs. It is not disputed that both Wayne Johnson, Vice President, and Benny Harwood, General Foreman, were cognizant on March 16, 1975, that ATC 3060 had a suspected leak and was en route to the corporation's Norfolk docks for inspection and possible repair on Monday, March 17, 1975.

1. 46 U.S.C. § 183(a) provides:

    The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

2. Allied Marine Industries, Inc. also wholly owns Allied Container Service, Inc., Chemphalt of Carolina, Inc., and Sea Port Supply Corporation. None of these subsidiaries are involved in the proceedings in the instant case.

ATC 3060 was within the parameters of Allied's property at the commencement of the workday on March 17, 1975. ATC 3060 was initially in the fleet area but it was moved to a position next to the dock during the morning. At approximately 7:30 A.M., Johnson directed Richard T. Waida, an employee of Allied holding the position of Assistant Port Engineer, to examine the barge for the suspected leak. Additionally, Powell, Allied's Yard Superintendent, requested labor pusher Turner to inspect the tanks of the ATC 3060 to see whether water was in the tanks. Turner reported that there was not any water in the tanks. Nevertheless, Powell personally inspected the tanks for the presence of water and then directed Benny Harwood, General Foreman, to have one of the barge's tanks air tested for a leak. At this time, Powell was aware that Waida had been assigned to inspect the barge for a leak.

ATC 3060 was air tested in an effort to discover the leak's source. This consisted of pumping air into the sealed fuel cargo hold, building up pressure inside the hold and painting the outside of the barge in the areas of suspected leak with soap. As the air escaped at the point of the leak, the soap bubbles thus disclosing the leak. Although Waida was in charge of the ATC 3060 repair, he testified that he did not direct the air tests to be performed nor was he aware who did order the tests. In contrast to Waida's testimony, Johnson testified that on two separate occasions he discussed the repair with Waida and inquired about the status of the leak. According to Johnson, Waida indicated that an air test was going to be performed and that the specific trouble had been located and the Coast Guard had been notified. The Court finds as a fact that Johnson asked specifically on two separate occasions about the repair of ATC 3060 on the day of the explosion and that he queried Waida whether the Coast Guard had been noti-

fied.[3] The Court concludes that although Assistant Port Engineer Waida had been assigned to the repair job, a clear line of responsibility and accountability had not been formulated as evidenced by the variety of employees involved in the repair and the failure of one employee to direct and supervise the repair.

The Court also finds as a fact that at the time of the explosion, Waida was aware that employees of Allied were doing hot work (welding) on the barge. This work was being done in the same location where Waida had observed Allied employees performing a soap test to find the leak's source. At the time of the explosion, Waida and Executive Vice President for Special Projects Ferrer were standing at the back of the barge measuring its stern for a purpose not connected with the leak repair.

The evidence adduced shows that Yard Superintendent Powell was aware that a fire watch, that is, additional personnel to stand by with fire fighting equipment, was requested for ATC 3060. This request was made by Benny Harwood, General Foreman. Overhearing the request for a fire watch, Powell suggested that a fire hose should be used in addition to the fire extinguisher. Powell testified that he assumed that if Harwood was requesting a fire watch that hot work (welding) was anticipated. The Court finds specifically that Powell, the yard superintendent, was cognizant that the ATC 3060's leak was going to be repaired by means of welding. The Court also concludes that Powell presumed that a gas free certificate for the ATC 3060 had been acquired although he did not make any inquiries into whether said certificate had been, in fact, secured. The Court also finds that Powell had not visibly seen whether there was a gas free certificate for ATC 3060. The evidence establishes that the barge was

---

3. The Coast Guard regulations require all ships to report leaks causing discharges to rivers or seas. Allied reported that the source of the leak had been located and was in the process

of being repaired. The Coast Guard also received a pollution report from Allied regarding the oil discharge into the York River at the AMOCO Yorktown refinery.

visible from the offices of the operations department of Allied.

### Gas Certificate Requirement

46 C.F.R. 35.01–1 (1975) provides in pertinent part:

"(a) The provisions of 'Standard for the Control of Gas Hazards on Vessels to be Repaired,' NFPA No. 306, published by Nation Fire Protection Association, 60 Batterymarch Street, Boston, Mass. 02110, shall be used as a guide in conducting the inspections and issuance of certificates required by this section.

"(b) Until an inspection has been made to determine that such operation can be undertaken with safety, no alterations, repairs, or other such operations involving riveting, welding, burning, or like fire-producing actions shall be made:

"(1) Within or on the boundaries of cargo tanks which have been used to carry flammable or combustible liquid or chemicals in bulk, or within spaces adjacent to such cargo tanks; or

"(2) Within or on the boundaries of fuel tanks; or,

"(3) To pipe lines, heating coils, pumps, fittings, or other appurtenances connected to such cargo or fuel tanks.

"(c) Such inspections shall be made and evidenced as follows:

"(1) In ports or places in the United States or its territories and possessions, the inspection shall be made by a marine chemist certificated by the National Fire Protection Association . . . If the inspection indicates that such operations can be undertaken with safety, a certificate setting forth the fact in writing and qualified as may be required, shall be issued by the certified marine chemist or the au-

thorized person before the work is started. Such qualifications shall include any requirements as may be deemed necessary to maintain, insofar as can reasonably be done, the safe conditions in the spaces certified throughout the operation and shall include such additional tests and certifications as considered required. Such qualifications and requirements shall include precautions necessary to eliminate or minimize hazards that may be present from protective coatings or residues from cargoes . . .

"(d) It shall be the responsibility of the senior officer present to secure copies of certificates issued by the certified marine chemist or such person authorized by the Officer in Charge, Marine Inspection. It shall be the responsibility of the senior officer present, insofar as the persons under his control are concerned, to maintain a safe condition on the vessel by full observance of all qualifications and requirements listed by the marine chemist in the certificate.

The evidence is uncontroverted that ATC 3060 did not have a gas free certificate as required by the federal regulations and the Court so finds.[4] Employees of Allied testified that it was the usual practice to obtain a certificate before any welding was done. The normal practice was for Eric Kaiser, Allied's safety director, to inspect the barge, test the atmospheric conditions and determine whether the barge was gas freed. It was Kaiser's job to conclude whether the atmosphere was "safe for men" to perform repair functions. Kaiser would also determine whether a gas free certificate was necessary.

Kaiser was the sole Allied employee designated as a "competent person" under the Occupational Safety and Health Act regulations. The designation was

---

**4.** The provisions of "Control of Gas Hazards on Vessels to be Repaired," NFPA No. 306, published by Nation Fire Protection Association, delineate with greater specificity the precautions that should be undertaken when hot work is conducted on tank barges. These pro-

visions set forth the definitions of hot work, tank barge and other relevant terms. Since these terms are not contested and it is undisputed that a gas free certificate was not obtained, it is unnecessary to discuss the requirements of these provisions.

made on February 10, 1975, by the Bureau of Labor Standards of the United States Department of Labor. The parameters of Kaiser's designation were "to ascertain that the atmospheres remain gas free and contain sufficient oxygen after certification by a N.F.P.A. certified marine chemist. Also, to conduct initial survey in vessels for oxygen and combustible atmospheres prior to entry of employees." Trial Exhibit 17. This form is signed by both Kaiser and Joseph W. Carriker, Executive Vice President of Allied. The evidence is uncontroverted that Kaiser did not test the atmosphere of the ATC 3060 on March 17, 1975. Kaiser was not contacted to inspect ATC 3060 nor did he undertake any efforts to have a marine chemist certify the barge as gas freed. The Court finds that Allied violated the OSHA regulations requiring a "competent person" to test the atmosphere of ATC 3060 prior to the entry of an employee into one of the tanks.

After inspecting and testing the atmosphere and concluding that it was free of gas, Kaiser or one of the employees would normally contact a local marine chemist who would test to determine whether the barge was gas freed. If the barge was gas freed, the chemist would issue a certificate attesting to said condition. Richard Waida testified that it would usually take one day to gas free a barge such as the ATC 3060. The marine chemist who issued certificates was generally available to Allied at two or three hours' notice. The evidence shows that at least four employees were authorized to contact the chemist to obtain a gas free certificate. Furthermore, the evidence shows that none of these individuals secured a gas free certificate.

The evidence is uncontradicted that Allied did not have any systematic procedure or method for contacting the marine chemist. Any number of employees had the authority to contact the chemist and, in fact, did contact the chemist. It appears that whichever employee was doing the repairs would obtain the certificate. The evidence supports the finding that Allied management personnel was aware that there was no chain of command for obtaining a chemist's gas free certificate.

When issued, several copies of the certificate are available at the repair site. According to Yard Superintendent Powell, the typical certificate repositories were that one copy was posted at the location of the repair, one was delivered to Safety Director Kaiser, and one to the shop foreman.

Wayne Johnson testified that although he did not know the specific nature of ATC 3060's cargo, he presumed that the barge would be gaseous because it had carried crude oil. Johnson was aware that federal regulations required a chemist's certificate that the barge was gas free prior to starting any hot work. The Court finds that Johnson, Vice President of Maintenance, had knowledge of the general nature of the cargo and that, imbued with this knowledge, was aware that the barge would have to be gas freed and certified as such prior to commencing any welding.

The Court finds that the cause of the ATC 3060 explosion was that the barge was not gas freed when welding was being performed on the barge. The Court further finds that the explosion would not have occurred had the federal regulations been complied with and the barge gas freed. The Court also finds that none of the Allied supervisory staff undertook any efforts to determine whether a chemist's certificate of gas free condition had been obtained. The Court concludes that Allied supervisory staff knew that the typical method of repairing a leak in a tank barge was by means of hot work. Furthermore, Allied supervisory staff knew that prior to any welding, a marine chemist must issue a gas free certificate for the area where the welding will occur. Nevertheless, Allied supervisory employees did not act in a manner commensurate with their knowledge to prevent the explosion.

Allied promulgated Safety Rules and Regulations on January 27, 1975. These regulations incorporate the federal regu-

lations governing hot work. The regulations also detail the OSHA regulation that employees should not enter tanks or compartments until "it has been ascertained by a competent person that the compartment, tank or rake is 'safe for men'." The Court finds that neither of these company regulations were followed by Allied employees on March 17, 1975. Yard Superintendent Powell testified that he was not aware of Allied's Safety Rules and Regulations until after the March 17, 1975 explosion. The accident occurred almost two (2) months after the effective date of the internal safety rules. Considering Powell's ignorance of the safety regulations, the Court also finds that Allied did not adequately inform and educate its employees regarding the requisites of the safety regulations.

### Violation of Coast Guard Regulation

A second statutory violation occurred involving the ATC 3060. The barge was originally certified by the Coast Guard to carry all grades of fuels and oils. Coast Guard regulations provided that ATC 3060 was scheduled to be drydocked and examined internally in November of 1974. In September, 1974 Allied requested that the Coast Guard extend the regulation's application for one year. On November 15, 1974, the Coast Guard issued a Certificate of Inspection for ATC 3060 permitting the barge to continue operating without drydocking and internal examination until November, 1975. The certificate unequivocally provides that the barge was inspected by the Coast Guard and approved solely for the carriage of Grade "D" oil. This document is unambiguous.

Allied does not deny receiving the document. William Bruce Law, Administrative Assistant to the Maintenance Vice President and son of the President of Allied, received the downgrading certificate from the Coast Guard. Law testified that both Wayne Johnson, Vice President of Maintenance, and Charles Ferrer, Allied Vice President of Special Projects, were aware of the downgrading of the tug to Grade D from all grades. Additionally, Allied has stipulated that Vice President of Special Projects Charles Ferrer was present as the owner's representative when ATC 3060 was downgraded to Grade D oil. Mr. Ferrer did not testify. Bruce Law testified that the Operations Department would be notified "as a matter of course."

Joseph Smith, Vice President of Operations, arranged for the ATC 3060 to meet the AMOCO Yorktown on March 15, 1975, and lighter 35,000 gallons of black oil. Smith had direct contact with the Amoco's Chicago office which arranged for the transporting of the oil to the Yorktown refinery. Smith testified that Amoco did not specifically inform him of the grade of the oil. However, Smith stated that the specific grade was not of major importance to him because Allied had three (3) barges with identical equipment and were certified at the same level. Smith believed that ATC 3060, 3061 and 3062 were certified to carry the type of oil Amoco desired to be transported. All barges were within the general vicinity of the AMOCO Yorktown. Smith testified that the first time he learned the general nature of the cargo was on Saturday, March 15, 1975. At that time, he was not advised of the crude oil's grade. Smith testified that he did not know that ATC 3060 had been downgraded by the Coast Guard and only authorized to carry Grade D crude oil. ATC 3060 was selected to transport the Amoco oil because, on March 14, 1975, the barge was in the closest proximity to the AMOCO Yorktown. Smith testified that the grades of oil have various flash points. 46 Code of Federal Regulations, Sections 30.10–15 and 30.-10–22, respectively, define Grade D as a combustible liquid having a flash point below 150° F. and above 80° F. and Grade C as a flammable liquid having a flash point of 80° F. or below. Chemical tests of the cargo actually carried on the ATC 3060 established its flash point at 68° F. The evidence supports the conclusion that grades of oil may not be ascertained by a mere visible inspection.

The grades appear virtually identical. It is conceded that a tankerman does not have the skill to determine the grade. Therefore, the tankerman of the ATC 3060 would not be expected to know the grade of the oil. Chemical analysis must be employed to determine the grade. It is undisputed that the AMOCO Yorktown was carrying light Iranian Grade C oil and that there was a substantial difference between flash points of the actual cargo and Grade D crude oils.

Smith testified that crude oil would generally be graded as either Grade C or D. Although ATC 3060 was downgraded in November, 1974 and the explosion occurred in March of 1975, Smith stated that he was not aware of the downgrading of the barge until after the accident. It is Smith's belief that the personnel of the maintenance department, specifically Wayne Johnson or Bruce Law, should have notified him of the downgrading of ATC 3060. At the trial, Smith stated that if he had known that the barge was only certified for Grade D, he would not have assigned the ATC 3060 to transport the Amoco oil.

William Law, President of Allied, testified that he was not aware of the downgrading of ATC 3060. Law testified that he did not know that the ATC 3060 was transporting a grade of oil that it was not authorized to carry. Law testified that he did not learn of the nature of the cargo until after the March 17, 1975, explosion. Allied's President, however, testified that employees, particularly the operations department, should have known the grade of oil to be transported in order to properly match the vessel to the cargo. It was Law's opinion that the tankerman transporting the oil should know the grade of the cargo. The testimony seems to support the conclusion that the barge's tankerman did not know the grade. Law confessed that "I was dumbfounded that it blew up  .  .  ."

Robert Wade, a superintendent at the AMOCO Yorktown refinery, testified that it would be customary of the Chicago headquarters to inform the transporting company of the cargo's grade. In the instant transaction, Smith testified that he did not ask nor was he informed of the specific grade of the cargo. Johnson testified that he did not know the specific grade of the cargo except for the general knowledge that it was crude oil. However, Johnson testified that Vice President of Operations Smith should have known the contents of the cargo.

■ The Court finds that although Smith did not know that ATC 3060 had been downgraded, he had an absolute duty as Vice President of Operations in charge of assigning vessels to convey cargoes to know the Coast Guard authorization or certification of each of his company's vessels under his control. Furthermore, he had immediate access to the Coast Guard certificates giving this information. Allied officers were located in the same building which was adjacent to its docking facilities on the Eastern Branch of the Elizabeth River. During the time of the downgrading and to the date of the explosion, Bruce Law's office and Smith's office were in close proximity. It was common knowledge to Allied officers that Bruce Law's office was the repository of all Coast Guard certificates. The Court finds that Smith had adequate opportunity to discover that the ATC 3060 had been downgraded.

The Court also finds that Allied lacked any procedure to inform the employees that the barge had been downgraded. Allied's Executive Vice President for Special Projects was cognizant of the downgrading and yet, the record does not show that he expended any efforts to notify affected personnel. Additionally, Vice President Smith was in a position to ascertain the grade of oil that the ATC 3060 lightered from the AMOCO Yorktown. The evidence substantiates that the Vice President of Maintenance had ample opportunity to learn that the barge had been downgraded, especially in light of the fact that his own administrative assistant was the overseer of all Coast Guard certificates.

The Court finds that the transporting of Grade C oil by the ATC 3060 in derogation of the Coast Guard certification contributed to the explosion aboard the ATC 3060 on March 17, 1975, as it was the residual of this cargo that exploded.

## CONCLUSIONS OF LAW

■ The evidence lucidly establishes that Allied was liable for the ATC 3060 explosion. The facts are overwhelming that the actions and inactions of Allied employees were the proximate cause of the explosion and subsequent fire aboard the ATC 3060. Allied is not entitled to exoneration from liability. Therefore, the fundamental question before the Court is whether Allied may receive the benefits of a limitation of liability.

■■ The party seeking exoneration from or limitation of liability has the burden of proof. *Coryell v. Phipps*, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943). In light of Allied's corporate ownership, its burden is to establish that the negligence heretofore found was not that "of an executive officer, manager or superintendent whose scope of authority includes supervision over the phase of the business out of which the loss or injury occurred." *Coryell v. Phipps*, 317 U.S. 406, 410, 63 S.Ct. 291, 293, 87 L.Ed. 363 (1943) *citing Spencer Kellogg & Sons v. Hicks*, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903 (1932). Allied must show that its management personnel did not have "privity or knowledge" of the causes of the explosion aboard the ATC 3060.

### Privity or Knowledge

Limitation of liability is available to the shipowner if the causes of the accident were not within the privity and knowledge of "managing officers" or "supervisory employees." Other courts have held that "[t]he title or rank of these employees is, by itself, of limited value in determining on which side of the line a particular case falls." *United States v. Standard Oil Company of California*, 495 F.2d 911, 917 (9th Cir. 1974). The truest measure whether employees are "managing officers" is "not as to

their being officers in a strict sense but as to the largeness of their authority." *United States, supra*, at 917, *citing Waterman Steamship Corporation v. Gay Cottons*, 414 F.2d 724, 731 (9th Cir. 1969) *citing In re P. Sanford Ross*, 204 F. 248, 251 (2d Cir. 1913). The Court is charged with examining which Allied employees have general powers over the entirety or a segment of the business in order to bind the corporation. Allied does not suggest that William Law, President, or the Vice Presidents Johnson, Smith or Ferrer are not supervisory employees. Rather, Allied argues that these individuals were without privity or knowledge of the causes of the ATC 3060 explosion, thus entitling Allied to the benefits of limitation of liability.

■ The "knowledge" of supervisory employees is not limited to what they in fact know. *The Cleveco*, 154 F.2d 605 (6th Cir. 1946) is the seminal case defining the type of knowledge required. In that case, the Sixth Circuit held that:

"knowledge means not only personal cognizance but also the means of knowledge—of which the owner or his superintendent is bound to avail himself—of contemplated loss or condition likely to produce or contribute to loss, unless appropriate means are adopted to prevent it." *The Cleveco, supra* at 613.

*The Cleveco* definition of knowledge has been cited with approval by numerous courts. *See e. g. Avera v. Florida Towing Corporation*, 322 F.2d 155 (5th Cir. 1963); *Daniels v. Trawler Sea Rambler*, 294 F.Supp. 228 (E.D.Va.1968).

Supervisory employees may not rest lackadaisically upon their personal knowledge but are charged with a duty to reasonably inspect and supervise their operations. *Great Atlantic & Pacific Tea Co. v. Brasileiro*, 159 F.2d 661, 665 (2d Cir. 1947)

■ The level of knowledge charged to supervisory employees varies relative to the ability of the supervisors to exercise control. Summarizing the law in

limitation proceedings, the Ninth Circuit concluded that:

"The great majority of the cases denying limitation of liability have involved old barges, tugs, and other vessels obviously more capable of control by the home office than a freighter thousands of miles away. And most of these cases involved either a long-standing practice of failing adequately to inspect the vessel, or otherwise to exercise control over activities in the home port." *Waterman Steamship Corporation v. Gay Cottons*, 414 F.2d 724, 733 (9th Cir. 1969).

■■ The record shows that all activities transpired at Allied's Norfolk, Virginia, facility. The corporate headquarters are located on the same premises where the ATC 3060 explosion occurred. All key supervisory personnel worked at this location and were cognizant that the ATC 3060 had a suspected leak and was scheduled to be repaired on March 17, 1975. In light of the proximity of Allied's headquarters to the location of the ATC 3060, Allied's duty to supervise and prevent hazardous conditions is elevated. *Sylve v. E. W. Gravolet Canning Company*, 278 F.Supp. 669, 673 (E.D.La.1967). The Court concludes that the Vice President of Maintenance Wayne Johnson vitiated his duty to inspect the progress of the repairs of the ATC 3060. The Court opines that had Johnson fulfilled his duties and conducted an inspection of the ATC 3060 repair effort, the explosion would not have occurred. *See, e. g. Waterman Steamship Corporation v. Gay Cottons*, 414 F.2d 724, 732 (9th Cir. 1969). Johnson's inspection would have discovered that the safety regulations had not been complied with. Johnson testified that he assumed that the ATC to be gaseous. The Court finds that in light of this assumption, Johnson should have ordered as a matter of course a gas free certificate. His failure to undertake such precautions imputes negligence to Allied's supervisory personnel.

The Court also believes that Allied's failure to adopt any systematic method to secure the gas free certifications by a marine chemist mandated by federal regulations constitutes negligence on the part of Allied's supervisory employees. The haphazard approach to regulatory compliance was a cause of the explosion. The evidence supports the conclusion that these employees knew or should have known that absent such procedures, an accident similar to the March 17, 1975, explosion would occur. This knowledge is also imputed to Allied's supervisory personnel solidifying the conclusion that Allied is not entitled to limitation of liability.

The Court further finds that the Vice President of Operations Joseph Smith did not perform his duties in an appropriate manner. The evidence shows clearly that had Smith inquired as to the type of cargo the ATC 3060 was scheduled to carry and as to the certification of the ATC 3060, that the barge would not have transported a grade of oil that it was not certified for. ATC 3060 was downgraded in November of 1974. The explosion occurred in March of 1975. The Court concludes that reasonable investigation and inspection by Smith would have discovered the downgrading. Smith's failure to inspect contributed to a condition that was a cause of the explosion. In light of the substantial disparity of flash points between the crude oil carried (68° F.) and Grade D oil (80° F. to 150° F.), the Court concludes that ATC 3060's transporting of the more combustible "C" Grade was a cause of the explosion. Smith's negligence is attributable to Allied and serves as another reason to deny limitation of liability.

The Court is not compelled to decide whether the actions of Powell, Waida, or Harwood fall within the ambit of "managerial officer" or "supervisory employee." Although there appears to be ample evidence to support such a finding, it is unnecessary to discuss these issues in light of the disposition.

It is the determination of this Court that the evidence on which its findings of fact have been based not only preponderates but is overwhelming. In view of this clear preponderance of the evidence

against Allied, it is unnecessary for the Court to determine if the violation of the statutory duties heretofore referred to invoke the doctrine set forth in *The Pennsylvania*, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148 (1873). This doctrine referred to as the Pennsylvania Rule provides that where a statutory duty is violated the violating party has the burden of establishing that the violation could not have caused the occurrence giving rise to the claim for damages.

Allied's petition for exoneration from or limitation of liability is Denied. Counsels for claimants are directed to present an appropriate Order to the Court within ten (10) days of the entry of this Opinion.