**Complaint of STEUART TRANSPORTATION COMPANY as Owner of the TANK BARGE STC 101 for Exoneration from or Limitation of Liability.**

Civ. A. No. 76–697–N.

United States District Court,
E. D. Virginia,
Norfolk Division.

July 29, 1977.

Robert M. Hughes, III, Philip N. Davey, Norfolk, Va., for plaintiff.

Morton H. Clark, Norfolk, Va., David E. Evans, Asst. Atty. Gen. of Va., Richmond, Va., Allen VanEmmerik, Trial Atty., Admiralty & Shipping Section, Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

CLARKE, District Judge.

On the morning of February 2, 1976, the Tank Barge STC 101, owned by plaintiff, Steuart Transportation Company (hereinafter referred to as "Steuart"), sank in the Chesapeake Bay approximately four miles south of Smith Point Light. The barge carried a full cargo of approximately 19,700 barrels of # 6 oil owned by defendant, Amoco Oil Company. A portion of this cargo of oil was lost following the sinking of the barge.

The STC 101 departed Amoco, Yorktown in tow of the Tug FALCON, owned by defendant, Allied Towing Company (hereinafter referred to as "Allied"), on the afternoon of February 1, 1976, enroute to Baltimore.

The tug and barge headed out of the York River and proceeded up the Chesapeake Bay. At approximately 4:00 A. M. February 2, the FALCON altered course toward the western shore of the Chesapeake Bay below Smith Point in order to obtain a lee in the face of adverse wind and sea conditions. At that time visibility was obscured in heavy snow. At approximately 6:00 A. M., when the snow had cleared, the master and mate of the FALCON were able to sight the Barge STC 101 visually and determined at that time that she had sunk by the stern.

At some time after the sinking, a quantity of oil escaped from the barge. It is stipulated that the amount was a "harmful amount" within the meaning of the Federal Water Pollution Control Act, 33 U.S.C. § 1321 (Supp.1977) (hereinafter referred to as "FWPCA") and was an "amount sufficient to cause damage to aquatic life in State waters or to the lands or beaches adjacent thereto" within the meaning of the State Water Control Law, Code of Virginia, § 62.1–44.34 (1973 Repl.Vol.).

In this proceeding, Steuart claims exoneration from or limitation of liability in connection with the sinking of Barge STC 101 and the resulting oil spill. The following claims have been made:

(1) Amoco claims against Steuart for its lost cargo;

(2) Allied claims against Steuart for damaged towing gear, as Amoco's bailee and for indemnification of penalties paid and/or claimed in connection with the spill;

(3) The Commonwealth of Virginia claims against Steuart for oil spill cleanup costs, statutory penalties, damage to state oyster beds, and injuries to wildlife and other natural resources;

(4) The United States claims against Steuart for oil spill cleanup costs, statutory penalties, and injuries to wildlife and other natural resources;

(5) Winfred E. Sutton, Sr. claims against Steuart for the cost of cleaning his boat;

(6) Steuart claims against Amoco for a general average contribution for the salvage of barge and cargo;

(7) Steuart claims against Allied for contribution or indemnification (based on allegations of negligence in towing the barge);

(8) Steuart claims against the United States for contribution or indemnification (based on allegations of negligence in weather forecasting and Coast Guard regulations);

(9) The Commonwealth of Virginia cross-claims against Allied for the same damages claimed against Steuart, in the event Allied is held responsible for the same.

Trial of the case was bifurcated, and the case is now before the Court on the issues of liability for the casualty and the right of Steuart to limitation of damages recoverable against it. This Court's jurisdiction is based upon 28 U.S.C. § 1333. (See also 33 U.S.C. § 1321(n) and 46 U.S.C. § 185).

Steuart asserts the right to limit recoveries against it under the provisions of two Federal statutes: the Limitation of Liability Act, 46 U.S.C. §§ 181–189 (1958)[1] and the FWPCA, 33 U.S.C. § 1321 (Supp.1977).[2]

---

**1.** 46 U.S.C. § 183(a) provides in pertinent part:

"The liability of the owner of any vessel, whether American or foreign, . . . for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not . . . exceed the amount or value of the interest of such owner in such vessel, and her freight then pending."

**2.** That Act provides, in part:

"(f)(1) Except where an owner or operator can prove that a discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party without regard to whether any such act or omission was or was not negligent, or any combination of the foregoing clauses [sic] such owner or operator of any vessel from which oil or a hazardous substance is discharged in violation of subsection (b)(3) of this section shall, notwithstanding any other provision of law, be liable to

Virginia asserts a right to damages under Virginia Code § 62.1–44.34:2 (Supp.1976).[3] This case presents serious and unsettled questions of the relationship of these acts. In determining liability and limitation of damages in this case, the Court has the duty of attempting a harmonious construction of the acts. To that end, it is useful at the outset to categorize the claims against Steuart thus: (A) federal spill cleanup costs; (B) Virginia spill cleanup costs; (C) other damage claims by Virginia; (D) other federal damage claims; and (E) all other claims.

On its face, the Limitation Act is applicable as a potential limit to all these claims. However, the subsequent enactment of the more specific FWPCA clearly cuts into the operation of the Limitation Act at least as to federal spill cleanup costs. *Askew v. American Waterways Operators, Inc.,* 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280, *reh. denied,* 412 U.S. 933, 93 S.Ct. 2746, 37 L.Ed.2d 162 (1973). To the owner of a vessel, some of the changes under FWPCA are advantageous and others are burden-

some. The right to limit under FWPCA exists unless "willfullness" by the owner is shown; while under the Limitation Act, the owner loses the right to limit if it is shown that he had "privity or knowledge" of the cause of the casualty. On the other hand, the Liability Act permits exoneration where the owner is free of fault, while FWPCA imposes strict liability for the costs of cleanup unless the sole cause of the spill is one or a combination of specified acts. Also, the amount recoverable even if limitation is granted may be much higher under FWPCA than under the Limitation Act.[4]

In this case, the combined claims for cleanup costs exceed the limits established in FWPCA, thus raising the question whether Virginia can recover its cleanup costs in full under Virginia Code § 62.1–44.34:2, notwithstanding the federal limitation statutes. Also, the other federal claims, other Virginia claims, and all other claims each exceed the Liability Act limit asserted by Steuart, raising the issue of Steuart's privity or knowledge as to the cause of the

the United States Government for the actual costs incurred under subsection (c) of this section for the removal of such oil or substance by the United States Government in an amount not to exceed $100 per gross ton of such vessel or $14,000,000, whichever is lesser, except that where the United States can show that such discharge was the result of willful negligence or willful misconduct within the privity and knowledge of the owner, such owner or operator shall be liable to the United States Government for the full amount of such costs. . . .

"(o)(1) Nothing in this section shall affect or modify in any way the obligations of any owner or operator of any vessel, or of any owner or operator of any onshore facility or offshore facility to any person or agency under any provision of law for damages to any publicly owned or privately owned property resulting from a discharge of any oil or hazardous substance or from the removal of any such oil or hazardous substance.

(2) Nothing in this section shall be construed as preempting any State or political subdivision thereof from imposing any requirement or liability with respect to the discharge of oil or hazardous substance into any waters within such State."

3. That section reads:

"§ 62.1–44.34:2. Liability for permitting discharge of oil from facility or vessel.—Any person, firm or corporation owning or operating any facility, or any vessel while within State waters, or any facility or vessel while beyond State waters, which permits or suffers a discharge of oil into State waters, shall be liable to the Commonwealth of Virginia for all costs of cleanup or property damage incurred by the State or a political subdivision thereof, and to any person showing damage to his property resulting from such discharge. In any suit to enforce the claims under this article, it shall not be necessary for the State, political subdivision, or person showing property damage, to plead or prove negligence in any form or manner on the part of the facility or vessel. It shall be a defense that the discharge was caused solely by (a) an act of God (b) an act of war or (c) an act or omission of a third party without regard to whether any such act or omission was or was not negligent, or any combination of the foregoing."

4. In the instant case the value of the STC 101, for purposes of the Liability Act, is claimed by Steuart to be $27,971.39. The gross tonnage of the barge multiplied by the $100 per ton statutory limit yields a total $122,300.00 limit under FWPCA. In other cases the value of the vessel under the Liability Act may exceed $100 per gross ton.

casualty under the provisions of the Limitation Act.

With this structure of conflicting claims in mind, the Court turns to the facts of the case. The STC 101 is a steel tank barge built in 1956. It measures 240.1 feet in length, 50.1 feet in breadth with a depth of 12.2 feet, weighing 1,223 gross tons. Its cargo capacity is approximately 20,000 barrels.

The evidence, presented orally at trial, by deposition, and in the form of exhibits, demonstrated that a badly worn ventilator cowling was torn loose from the deck of the STC 101 during the night of February 1–2, 1976, allowing water to enter and fill the pump room of the barge located below the deck at the stern of the vessel. It was also established that at the beginning of the voyage the scupper plugs were not removed from the eighteen inch high spill rail surrounding the cargo hatches. This allowed an unknown quantity of water to build up within the spill rail, weighing down the vessel. The Court finds that these two events, the filling of the pump room and spill rail with water, caused the barge to sink resulting in the oil spill involved in the claims presented in this case.

 The badly deteriorated condition of the flanges on the port side vent and deck cowls was amply demonstrated by the pictures in evidence and testimony of the experts who examined the barge after the casualty. The pictures and testimony establish that the deterioration was not recent or hidden and that a reasonably careful inspection would have disclosed the problem. The severe rust, scale, and wastage of metal found on both deck and vent flanges indicates that a reasonable inspection would have raised serious questions about the soundness of this deck fitting. Steuart argues that it maintained thorough inspection procedures, but this contention is not borne out by the evidence. The testimony of Steuart's employees indicates a haphazard non-system of inspection. No provision was made for insuring actual checking of vital aspects of the barge. A corporation, to operate responsibly, must implement systems which delegate necessary duties to specific individuals, so that one is able to ascertain that needed precautions have in fact been carried out. It is not a sufficient performance of an owner's duties to tell a number of people to inspect as part of their jobs and hope that everything that needs periodic inspection will receive it. Similar failures to establish internal systematic procedures were cited as negligence by this Court in *Complaint of Allied Towing Corp. (Tankbarge ATC 3060)*, 409 F.Supp. 180 (E.D.Va.1976) (no method of communicating certificate downgrading; no system of insuring obtaining of gas free certificate). The failure of Steuart's managers and superintendents to discover and remedy this defect in the barge amounts to negligence within the privity and knowledge of Steuart. *Spencer Kellogg & Sons v. Hicks*, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903 (1932). See *Complaint of Allied Towing Corp. (Tankbarge ATC 3060), supra; Puamier v. Barge BT 1793*, 395 F.Supp. 1019, 1034–35 (E.D.Va.1974). See also discussion and cases cited in 3 Benedict on Admiralty (7th ed.) § 42, nn. 1–2 (1975). There is no evidence, however, that Steuart's failure to recognize and correct the deterioration of one of the deck closures was in any sense willful. The evidence all leads to a finding of ordinary negligence.

Negligence within the privity and knowledge of Steuart having been found to be a cause of the casualty, the possible contributing negligence of other parties must be considered.

As to the acts and omissions of Allied Towing and its employees, the Court concludes that Allied did nothing unreasonable under the circumstances and that, in any event, its actions did not cause the casualty.

 Steuart contends that the falling barometer readings, if heeded by a reasonable mariner, would have led the master of the Tug FALCON to seek refuge in the Rappahannock River, thereby avoiding the worst of the storm. This argument fails for a number of reasons. A ship's captain is entitled, and indeed should be expected, to rely on the continuous radio broadcasts of

weather forecasts by the United States Weather Service. The evidence presented showed that falling barometer readings generally precede or accompany wind or storms. However, accurate prediction of the timing and intensity of bad weather requires expert consideration of many factors in addition to changes in atmospheric pressure. The best source for this information is the weather broadcasts.

The first indication by weather broadcast of especially heavy weather for Chesapeake Bay was a warning broadcast sometime after 1:00 A. M. on February 2, 1976. That warning indicated that a gale warning (northwest winds 25 to 35 knots with stronger gusts) was to go into effect at 5:00 A. M. that day. By the time this message could have been received by the tug, the flotilla's passage had proceeded well north of the Rappahannock, and refuge there was no longer a reasonable course. The earlier forecasts and weather conditions provide no basis for a contention that the tug was required, in the exercise of due care, to seek refuge at some time when the Rappahannock was still a possible haven. Indeed, the evidence indicates that even the one o'clock warning did not require the seeking of shelter. The tug and barge were both designed to withstand the wind and waves predicted in that warning and actually encountered. As such, the FALCON was not required to seek refuge, and her failure to do so did not proximately cause the barge to sink. If the barge had been sound, it would not have sunk.

█ Both Steuart and Virginia claim Allied was negligent because the tug captain and mate failed to inspect the barge properly before proceeding with the tow. Although there is some question whether this issue has been properly raised in the pleadings, the Court will consider it, inasmuch as evidence concerning it was presented at trial. See Rule 15(b), Federal Rules of Civil Procedure. Based on the evidence presented, the Court concludes that the basic duty of a tug captain regarding inspection of a barge under time char-

ter accompanied by a certificated tankerman consists of checking load, trim, and general condition. The tug captain should not be expected to follow the tankerman and check to see that each dog or fitting is secure. Nor would it be reasonable for the captain to inspect the barge in every detail for seaworthiness. He is entitled to rely on the expectation that he has been furnished a sound vessel with competent crew.

Thus, Allied is in no way responsible for the casualty. Steuart's liability is not relieved on that account.

Steuart asserts that the United States contributed to the casualty by inadequate weather forecasting and requiring the use of small scupper plugs. These contentions will be discussed separately.

█ The findings detailed above with respect to Allied's responsibility for weather conditions largely dispose of the claim that the United States contributed to the casualty by its weather forecasting activities. Even assuming that the United States could be held for negligent performance of an activity relied upon by the public,[5] it is clear that no such contributing negligence is present in this case. Given the vagaries of the weather, mere error in a forecast is insufficient to establish negligence. See *Walker v. Harris*, 335 F.2d 185, 193–94 (5th Cir.), *cert. denied* 379 U.S. 930, 85 S.Ct. 326, 13 L.Ed.2d 342 (1964); Cf. *Gill v. United States*, 429 F.2d 1072 (5th Cir. 1970) (air traffic controller provided inaccurate account of weather conditions: Government held liable).

Furthermore, the Court notes that, just as with Allied's allegedly unreasonable disregard of the weather, the adverse weather conditions were simply not the proximate cause of the sinking. The barge, properly maintained, would have been able to handle the weather.

█ Steuart also contends that the United States contributed to this casualty by requiring the installation of four-inch diameter scupper holes and plugs in place of

**5.** See *Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955).

much larger freeing ports in the eighteen-inch high spill rail.[6] There was evidence tending to show that the filling of spill rail during the voyage substantially increased the danger of sinking. Limitations in the field of naval architecture make it impossible to determine whether the filled pump room alone could cause or did cause the sinking in heavy seas. Also unknown is the amount of water retained within the spill rail prior to the sinking. Even assuming there was a substantial amount of water inside the rail and that this circumstance proximately contributed to the casualty, however, Steuart has shown no negligence attributable to the United States.

It is uncontroverted that the scupper plugs were not removed by Steuart's tankerman prior to the voyage, even though Steuart ordinarily requires that this be done. With the plugs in place, the spill rail becomes a weather tight container capable of holding a large quantity of water on deck. No matter how large the port openings were permitted to be, they would have been ineffective if left unopen. Thus, the direct cause of water accumulation in the spill rail must be attributed to Steuart—not the United States.[7]

Furthermore, Steuart's evidence failed to prove that the four-inch plugs were too

small to carry away the accumulations reasonably to be encountered in Chesapeake Bay service. Although larger ports would obviously clear the deck more quickly, Steuart made no convincing showing that the scuppers actually on the barge are inadequate to keep the deck reasonably clear of accumulated water. No quantitative or even anecdotal evidence was presented to demonstrate the need for larger holes. The Court finds the conclusory statements of inadequacy unpersuasive.

■■■ Having resolved the factual issues pertinent to each claim, the Court turns to the legal effects of its factual determinations. Steuart is not entitled to limitation of general claims against it under the Liability Act. Steuart is entitled to limitation under FWPCA. Steuart is not entitled to contribution or indemnity from Allied or the United States for any damages assessed against it. Virginia's claims against Allied are not allowed. Virginia Code § 62.1–44.34:2, which provides for the liability of "operators" such as Allied, allows as a defense the responsibility of a third party—in this case, Steuart. Hence, the provisions of the statute do not impose liability on Allied for the consequences of the spill. The penalty provision of Virginia Code § 62.1–44.32 is, by its own terms,

**6.** The Coast Guard does require that oil barges be equipped with spill rails and that the scupper plugs be in place during loading and discharging of cargo. 33 C.F.R. 155.310, 156.120. This is to prevent inadvertent oil spills while the cargo hatches are not secured. There are apparently no requirements as to the height of the spill rail. There was no showing that the Coast Guard requires the plugs be in place when the barge was under way. Tankerman Gates testified that he had some understanding that the plugs were to be in place at all times, based on a Coast Guard citation given him for having the plugs out while at a dock. No adequate basis for his "understanding" extending to voyages was presented. Indeed, Gates testified that he knew of no specific Coast Guard requirement that the plugs be in during a voyage, and the Court has found none. There would be little reason to permit any plugs if they were never to be removed. Common sense would dictate to the contrary.

**7.** In view of the Court's other rulings, it is unnecessary to decide whether the tankerman's actions were within the "privity and knowl-

edge" of Steuart. The Court merely notes that evidence was presented tending to show inadequate training and supervision of the tankerman by Steuart, and tending to show that supervisory personnel of Steuart had been told by Gates that he intended to leave the plugs in place and did not object to the practice. See *Complaint of Allied Towing Corp. (Tankbarge ATC 3060)*, 409 F.Supp. 180 (E.D.Va.1976).

It is also unnecessary to make findings concerning the effect of the allegedly defective condition of the cargo hatch gaskets, ullage opening covers, and hatch cover dogs and the alleged failure of the tankerman properly to dog the cargo hatches or whether such conditions and acts were within the "privity and knowledge" of Steuart. Those factors, if they contributed to the fact or amount of oil spillage, are attributable only to Steuart. Their presence or absence does not affect Steuart's liability based on the other findings of the Court.

applicable only to "owners." As an operator, Allied is not liable under that section.

■ Steuart's general average claim against Amoco must also fail because Steuart was itself responsible for the peril which threatened ship and cargo. See 46 U.S.C. §§ 190–196; 2 Benedict on Admiralty (7th ed.) § 186 and cases cited therein; Gilmore & Black, *The Law of Admiralty* (2d ed. 1975) § 5–13.

■ There remains to be determined the effect of the FWPCA on the Virginia oil cleanup statute. Because Steuart is not entitled to general limitation, it is not necessary to decide whether the Limitation Act is applicable to claims arising under a statute such as Virginia Code § 62.1–44.34:2.[8] It is necessary to decide whether FWPCA limits the Virginia Act.

Analysis of this issue begins with the recent United States Supreme Court case, *Askew v. American Waterways Operators, Inc.*, 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973). In that case, the Court ruled a Florida statute which created liability for damages resulting from oil spills did not conflict with and was not preempted by FWPCA. This ruling was based on the fact that FWPCA did not purport to deal with damages other than oil spill cleanup costs. The Court relied on the language in subsection (*o*) of the Act which specifically authorizes states to enact protective legislation. Accordingly, all claims, other than cleanup costs, created by the Virginia Act or common law or other federal law may be presented in this case for determination of the existence and amount of compensable losses.[9] *Askew, supra,* at 332–36, 93 S.Ct. 1590.

The Supreme Court in *Askew* declined to rule whether either federal act imposes a limit on the amount a state may recover in the way of expended cleanup costs. "It is sufficient for this day to hold that there is room for state action in cleaning up the waters of a State and recouping, *at least* within federal limits, so far as vessels are concerned, her costs." *Id.* at 332, 93 S.Ct. at 1595 [emphasis added].

One issue thus reserved in *Askew* is presented here because the combined federal state cleanup costs exceed the limit set by FWPCA. The Virginia statute by its own terms provides no limit on the amount of cleanup costs recoverable by the State. In this sense, it can be said to conflict with FWPCA which limits a shipowner's liability to $100 per gross ton of the vessel. The direct conflict disappears if FWPCA is construed as a limitation only as to recovery of *federal* cleanup costs. Such a construction is in accord with the language, policy, and congressional intent embodied in FWPCA. A contrary construction of FWPCA leads to other possible conflicts. The fund created by FWPCA purports to be for the benefit of the United States. Allowing Virginia a pro rata share of the fund would reduce the amount available to the Federal Government. Totally denying Virginia's claim for compensation would frustrate the general purposes of the Act—encouraging prompt cooperative cleanup efforts.

8. In this regard, see *Complaint of Harbor Towing Corp. (Barge Shamrock)*, 335 F.Supp. 1150 (D.Md.1971). That case did not consider the effect of FWPCA on Liability Act coverage of oil spill cleanup damages. The principle announced in *Wyandotte Transportation Co. v. United States*, 398 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967), as discussed in *In re Chinese Maritime Trust, Ltd.*, 478 F.2d 1357 (2d Cir. 1973), could lead to the conclusion that FWPCA eliminates application of Liability Act limits as to all claims for oil spill cleanup costs. At least as to federal oil spill cleanup costs, the language "notwithstanding any other provision of law" in § 1321(f)(1) certainly appears to preclude application of the Liability Act.

9. The Court, of course, at this time expresses no opinion as to the validity of any of the claims filed in this action, either as to amount or allowability. Some of the claims, such as those for damaged property and lost cargo, are those traditionally found in tort litigation. Others, such as those for lost wildlife, are less commonly claimed as compensable injuries. Cf. *Maine v. M/V Tamano*, 357 F.Supp. 1097 (D.Maine 1973); *Maryland v. Amerada Hess Corp.*, 350 F.Supp. 1060 (D.Md.1970). See also "State Protection of Its Economy and Environment: Parens Patriae Suits for Damages," 6 Col.J.L. & Soc.Prob. 411 (1970).

The language of the Act supports removal of Virginia's claim in two ways. The liability, duty, authority, limitation and other positive provisions all speak to the Federal Government involvement. This implies that the limitation of liability in the Act is intended as no more than the Federal Government's decision that it, rather than private parties (even those somewhat at fault), should bear the expense of truly catastrophic oil cleanup costs. The provisions in subsection (*o*), waiving preemption, support this reasoning by specifically permitting states to impose liability with respect to the discharge of oil within the state. Virginia has imposed such liability.[10]

Policy considerations also dictate allowance of Virginia's claim. The FWPCA recognizes that cleanup efforts will be directed and spearheaded by the Federal Government. The Federal Government's willingness to limit its claims, based presumably on an assessment of its ability to bear such costs, should not be construed to bar recovery of costs by parties, acting pursuant to lawful authority, who have provided significant aid to the cleanup effort.

The conclusion that the FWPCA was not intended to preclude the full operation of state statutes such as Virginia Code § 62.1–44.34:2 is further supported by the Conference Report on the federal statute:

> "Paragraph (2) of subsection (*o*) disclaims any intention of preempting any State or political subdivision from imposing any requirement or liability with respect to the discharge of oil into waters in that State. Thus, any State would be free to provide requirements and penalties similar to those imposed by this section or additional requirements and penalties."

1970 *U. S. Code, Cong. & Admin. News, 91st Cong., 2d Sess.*, pp. 2691, 2727. See also *id.* at pp. 2714–15: "This limitation on liability [to the United States] is intended to be the only limitation on liability" for discharges covered by the Act.

Interpretation of the FWPCA as harmonious with state laws providing for state recovery of cleanup costs follows the only reported judicial holding on the question which this Court has found. In *Portland Pipe Line Corp. v. Environmental Improvement Comm.*, 307 A.2d 1, 1973 A.M.C. 1341 (Me.1973), the Supreme Judicial Court of Maine upheld a comprehensive Maine statute dealing with oil spills against a broad based attack on its validity. Specifically, after careful analysis of *Askew*, that Court considered the effect of FWPCA limits as to onshore facilities and concluded:

> "The Federal Act refers specifically to *federal* clean-up costs.

> "In light of the contemplated federal-state cooperation in containing and cleaning up oil spills, it is unlikely that if such a joint effort resulted in the Federal Government spending eight million dollars, that Congress intended the State to go unreimbursed. . . .

> "We hold that Congress did not intend to restrict the states to the eight million dollar limit imposed on reimbursement of federal clean-up costs.

> "The Legislature has not created a conflict with the Federal Act by failing to so limit liability under the Act."

*Id.* at 44–45, 1973 A.M.C. at 1381 [emphasis in original; footnote omitted].

This Court agrees that the same reasoning applies in this case under the Virginia statute and permits Virginia to present its entire claim for oil spill cleanup costs without limit.[11]

■ As to the United States' claim for cleanup costs, the Court holds that FWPCA acts as a limit to that claim regardless of

---

**10.** The possibility that Virginia may be entitled to seek reimbursement under subsection (c)(2)(H) of the Act does not undermine this reasoning. The State is still empowered to hold the culpable party responsible under its own laws without relying on federal funds.

**11.** In light of this ruling, it is unnecessary to rule on other contentions raised by Virginia that the civil penalties it claims against Steuart are not subject to any federal limitation because they represent a direct exercise of the state's police power, outside the ambit of the federal statutes.

the basis on which it is made. By enacting FWPCA, Congress comprehensively established standards and limits of liability for oil spill cleanup costs. The Government will not be permitted to present a claim for such costs under general maritime law, common law, or other statutes.[12] See 3 Benedict on Admiralty § 112; contra Gilmore & Black, *The Law of Admiralty* 828–29.

In accordance with foregoing findings, reasoning and the authorities cited, it is ORDERED: The claims of Steuart for contribution or indemnity against Allied, Amoco, and the United States be DISMISSED; Steuart's claim for exoneration from or limitation of liability under 46 U.S.C. §§ 181–89 is DENIED; the Commonwealth of Virginia's cross-claim against Allied is DISMISSED; and the claims of Amoco, Allied, Virginia, the United States, and Winfred Sutton, Sr., will be allowed as proved except the United States is limited in recovery of cleanup costs to $122,300.00.

---

12. In a case where liability is established pursuant to the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331–43, FWPCA does not apply as a limit. 33 U.S.C. § 1321(i).