**SHEBBY DREDGING CO., INC., Plaintiff,**

v.

**SMITH BROTHERS, INC., and Michael D. Smith, Defendants.**

**SMITH BROTHERS, INC., Plaintiff,**

v.

**SHEBBY DREDGING CO., INC., Defendant.**

**Civ. Nos. H–77–1545, H–77–1546.**

United States District Court, D. Maryland.

May 9, 1979.

Louis G. Close, Jr., Baltimore, Md., for plaintiff in Civ. No. H–77–1545 and for defendant in Civ. No. H–77–1546.

C. Edward Hartman, II and J. Daniel Berry, Annapolis, Md., for defendants in Civ. No. H–77–1545 and for plaintiff in Civ. No. H–77–1546.

ALEXANDER HARVEY, II, District Judge:

In the early morning hours of April 2, 1977, the dredge MARILYN sank in approximately twenty feet of water, as it was heading into Hooper Strait in the Chesapeake Bay, near the mouth of the Honga River. At the time, the MARILYN was being towed by the tug HAWK.

The sinking of this dredge has resulted in filing of two separate civil actions, both of which are now before the Court for decision. The owner of the dredge MARILYN is Shebby Dredging Co., Inc. (hereinafter "Shebby"), a family-owned corporation engaged in the dredging business. Shebby filed suit in this Court under Rule 9(h), naming as defendants Smith Bros., Inc. (hereinafter "Smith Bros.") and one of its employees, Michael D. Smith, who was the master of the tug HAWK when the sinking occurred. Smith Bros., a marine contractor, does pile driving, salvage and other marine work and is the owner of the HAWK. In the complaint it filed in Civil No. H–77–1545, Shebby has alleged that while the MARILYN was being towed by the HAWK on April 1 and April 2, 1977, the defendants conducted the towing operation in a negligent manner, and Shebby has asserted that such negligence was the proximate cause of the sinking of the dredge in the early morning hours of April 2, 1977. In this action, Shebby is seeking damages in the amount of $71,924.13 for costs incurred in raising the dredge, for costs incurred in repairing and refurbishing the dredge once it was raised, and for additional damages sustained by Shebby when it rented another dredge to complete a job which it had contracted to undertake with the dredge MARILYN.

In denying liability, defendants in Civil No. H–77–1545 assert that they fully performed their duty to exercise such reasonable care and maritime skill in the towing operation as a prudent navigator would employ in the performance of similar services. These defendants have further asserted that they are not liable to Shebby for damages resulting from the sinking because the dredge itself was unseaworthy and because the master of the dredge was in command of the towing operation and should be held responsible for any action taken which led to the sinking.

Smith Bros. itself filed a suit against Shebby in the District Court of Maryland for Anne Arundel County, seeking to recover $1,931.82, allegedly due for towing services rendered. That action was removed to this Court pursuant to 28 U.S.C. § 1333, and has been docketed as Civil No. H–77–1546. The two cases have been consolidated and tried together, pursuant to Rule 42(a), F.R. Civ.P.

The non-jury trial lasted some four days, and the evidence pertaining to many of the issues was sharply conflicting. In making its findings, the Court has given due regard to the credibility of the witnesses. This Court's findings of fact and conclusions of law, under Rule 52(a), F.R.Civ.P., are embodied herein, whether or not expressly so characterized.

I

*The Facts*

Frank J. Shebby and his wife operate a small dredging business which they have incorporated. Frank Shebby is the President and is responsible for all details concerning dredging operations, and his wife, Betty R. Shebby, the Vice President, is in charge of the books and records. Frank Shebby himself designed and built the dredge MARILYN some twenty years ago. Various improvements and repairs of the dredge were made from time to time since it was built, but the evidence indicates that at the time of the sinking in early April of 1977, the MARILYN was not in good shape. Indeed, it had previously sunk on two prior occasions, although never while under tow.

From October 1976 until March 1, 1977, the MARILYN was located at Joppatowne, Harford County, Maryland, where it had been doing work during the fall months. The winter of 1976–1977 was a particularly severe one in the Maryland area, and the dredge had been locked in the ice for several months at its Joppatowne location. On January 3, 1977, Shebby had entered into a contract with Somerset County for the performance of certain dredging work in Dames Quarter Creek, Dames Quarter, Maryland. Shebby had bid on the job and had been awarded the contract at a price of $93,430.00. The contract required that the work be done between January 20, 1977 and June 1, 1977.

The evidence indicates that Frank Shebby operated his dredging business in a somewhat casual and disorganized manner. In late March 1977, with only a few months left to complete the Dames Quarter job, Frank Shebby made arrangements for transporting the MARILYN and other necessary equipment across Chesapeake Bay, from Joppatowne in Harford County on the Western Shore of the Bay to Dames Quarter Creek in Somerset County on the Eastern Shore of the Bay. Besides the dredge, he intended to take along a small tugboat which he owned (the BETTY R), a fuel barge, a derrick or work barge, approximately 1,000 feet of floating pipe and a small skiff or work boat. Arrangements for the towing of this flotilla from the Western to the Eastern Shore of Maryland were quite haphazard. At times, Shebby's small boat, the BETTY R, itself did the towing or assisted in the towing. At other times, two other firms performed the towing operations, Mohawk Marine Services, Inc. and Smith Bros. At all times, Shebby's employee, Roland M. Sellers, acted as master of the MARILYN and accompanied the flotilla.

The first part of the towing operation was performed by the MOHAWK, a power boat owned by Mohawk Marine, assisted by the BETTY R. A 50-foot Vineyard cruiser, the MOHAWK is essentially a pleasure boat, and with the assistance of Shebby's own small tugboat, the BETTY R, it managed with some difficulty to tow the flotilla consisting of the MARILYN and related equipment from Joppatowne across the Bay to Lowe's Wharf, which is located in Talbot County. Sellers had been in charge of the dredge and its related equipment, and he was quite unhappy with the towing operation across the Bay, mainly because of the lack of power of the MOHAWK. MOHAWK personnel were told that they were no longer needed, and Frank Shebby then undertook to try to find another means for completing the trip down the Bay to the dredging site in Somerset County.

On March 27, 1977, Frank Shebby telephoned Kenneth W. Smith, the President of Smith Bros., a firm located in Galesville, Maryland, which does marine construction and other related work. Frank Shebby asked Mr. Smith if he could furnish a tug to tow the flotilla down the Bay to the job site in Somerset County. Smith declined because he did not then have a licensed tug operator available. Shebby suggested that he himself would provide a tug captain, but Smith said he did not want a stranger on board one of his tugs. Unable to secure anyone else to perform the towing operation and anxious to begin his Somerset County job at once, Frank Shebby called Smith back several days later and pleaded with him to undertake the towing operation. Smith finally relented and agreed to furnish the tug HAWK, with his nephew, Michael D. Smith, as the captain and Robert Bast, another employee, as the deckhand. The parties orally agreed on a contract price of $45 per hour, plus time and a half for each of the men on board in excess of ten hours.

The towing job was to start the next day, March 31, 1977. However, the wind was blowing too hard that day, and it was not until April 1 that the towing operation actually commenced. It was agreed that the HAWK, which would be coming up from Bivalve Harbor on the Nanticoke River, would meet the flotilla off Poplar Island, and it was the BETTY R which did the initial towing from Lowe's Wharf out into the Bay. About 2:00 P.M. on April 1, 1977, the HAWK met the MARILYN and its related equipment off Poplar Island and

started the tow down the Bay. The BET-TY R was then tied up alongside the HAWK. Weather conditions were very good at the time, and the sea was calm. The weather forecast then called for light winds and clear and mild weather through-out the night. The planned route of the flotilla was down the eastern side of the Bay, around Hooper Island, through the Hooper Strait, across Tangier Sound to the mouth of the Wicomico River and then on into the Dames Quarter job site. Michael Smith, the master of the tug, had estimated that he would reach Hooper Strait around daybreak. He had concluded that he did not want to go through the Strait during the nighttime hours. Sellers was advised of that plan and agreed. By nightfall on April 1, the flotilla was beyond the Little Chop-tank River. The weather report at that time called for winds of from 5 to 10 knots and light seas during the night, with the wind and seas increasing somewhat the next day.

Between midnight and 1:00 A.M. on April 2, the flotilla passed Hooper Island Light. The wind at that time had increased to more than 10 knots and was blowing from the south. The BETTY R, which during the day had been tied alongside the HAWK, had moved early in the evening and laid alongside the fuel barge and later at the end of the pipeline, with its engines idling in gear. After he passed Hooper Island, Michael Smith changed his course to a more easterly direction, heading for Hooper Strait. With the wind from the south, the result was that the seas were not being met head on but were abeam.

At approximately 4:30 A.M., Sellers, then aboard the BETTY R, which had not been back to the HAWK since early in the evening, decided to check the MARILYN. Pulling alongside, he noted that the dredge was rocking badly, and he went aboard with his crewhand, Major. Sellers then observed approximately four inches of water in the dredge, but he did not pump it out because the dredge was rolling so badly that it was not safe. Returning alongside the HAWK on the BETTY R, Sellers flashed his light, and Major yelled at Smith, telling him that the dredge was in danger and suggesting

that Smith turn into the wind. Smith slowed down and did as he was instructed. However, the dredge continued to rock from side to side and take on water. Some ten or twelve minutes later, the dredge foundered and sank.

## II

### Discussion

■ The principles of law to be applied in determining liability for a loss occurring under a towage contract are well known. In general, the owner of the tow is respon-sible for its seaworthiness and the owner of the tug for its safe navigation. *Curtis Bay Towing Co. v. Southern Lighterage Corp.*, 200 F.2d 33, 34 (4th Cir. 1952); *THE LIZ-ZIE M. WALKER*, 3 F.2d 921 (4th Cir. 1925); *THE RADNOR*, 21 F.2d 982 (D.Md. 1927). However, the owner of the tug is not an insurer, and the mere loss of the tow raises no presumption of fault. *Stevens v. THE WHITE CITY*, 285 U.S. 195, 52 S.Ct. 21, 76 L.Ed. 517 (1932); *Curtis Bay Towing Co. v. Southern Lighterage Corp., supra* at 34. Thus, the mere happening of an acci-dent does not raise any presumption of fault or negligence on the part of the tug. *Southgate v. Eastern Transp. Co.*, 21 F.2d 47 (4th Cir. 1927); *Valentine Waterways Corporation v. Tug CHOPTANK*, 260 F.Supp. 210 (E.D.Va.1966), *aff'd* 380 F.2d 381, 382 (4th Cir. 1967).

■ The owner of the tug has a duty to exercise such reasonable care and mari-time skill as prudent navigators usually em-ploy in similar undertakings and with such consideration as special circumstances may require. *Curtis Bay Towing Co. v. South-ern Lighterage Corp., supra* at 35; *Valen-tine Waterways Corporation v. Tug CHOP-TANK, supra* at 212–213. Before it may amount to fault, error of a master must be gross and flagrant, and a master will be held for lack of seamanship only in case his conduct is outside the range of possible discretion. *THE FRED SMARTLY, JR.*, 100 F.2d 971, 974 (4th Cir. 1939); *Frank Jacobus Transportation Co. v. Moran Tow-ing & Transportation Co., Inc.*, 67 F.2d 603, 605 (2d Cir. 1933).

Although the owner of the tow is responsible for its seaworthiness, the burden of proof to establish that a vessel is unseaworthy rests upon the party making such assertion. *M. P. Howlett, Inc. v. Tug DALZELLIDO*, 324 F.Supp. 912, 917 (S.D. N.Y.1971). However, one who offers a vessel for towing holds her out to be sufficiently staunch and strong to withstand the ordinary perils to be encountered on the voyage. *Valentine Waterways Corporation v. Tug CHOPTANK, supra* at 213. Accordingly, there is a presumption that a tow is unseaworthy when she sinks under normal conditions in the absence of proof of improper handling. *Id.* at 214; *Ohio River Company v. M/V IRENE CHOTIN*, 238 F.Supp. 114, 118–119 (E.D.La.1965); *Houma Well Service, Inc. v. Tug CAPT. O'BRIEN*, 312 F.Supp. 257, 260 (E.D.La.1970).

### (a) *Proof of Fault*

On the record here, this Court finds and concludes that Shebby has not met its burden of proving fault on the part of the master of the tug HAWK by a preponderance of the evidence.[1] There has been no showing here that Michael D. Smith did not exercise such reasonable care and maritime skill as a prudent navigator might employ under all the circumstances pertaining to this towing operation. The weather reports were favorable when he set out during the afternoon of April 1, indicating winds of 5 to 10 knots. During the night when later reports were received, it was indicated that the winds would be increasing to 10 to 15 knots in the morning. These were hardly unusual conditions. When increased winds and heavier seas were encountered during the early morning hours of April 2, the flotilla was in the vicinity of the Hooper Islands, and there was no harbor or bay available for the flotilla to head into. Indeed, once the tow had proceeded beyond the Little Choptank River, there was no haven available short of Hooper Strait. Under similar facts, the Court in *Complaint*

of *Steuart Transportation Company*, 435 F.Supp. 798, 804 (E.D.Va.1977), *aff'd* 596 F.2d 609 (4th Cir. 1979), found no negligence on the part of the master of a tugboat.

Shebby contends that Michael Smith should not have slowed down as he did once he passed Hooper's Light. However, had he not slowed down, he would have had to pass through Hooper Strait during the night. Under all the circumstances, it was entirely reasonable for Michael Smith to reject this alternative. With a flotilla extending some 1500 feet and including the dredge MARILYN, a fuel barge, a derrick barge and some 1000 feet of floating pipe, it would have been an extremely hazardous operation to attempt to pass through Hooper Strait in the dark. As the charts indicate, the channel is a narrow and crooked one, and testimony in the case further discloses that a vessel navigating the Strait must also face tricky tides. The plan to reach Hooper Strait at daybreak had been decided upon at the start of the HAWK's towing operation and had been approved by Sellers.

Shebby relies on the fact that Michael Smith did notice a slight list of the dredge before Sellers came alongside and told him to slow down. However, until Sellers had actually made the trip to the dredge to inspect it around 4:30 A.M. and then returned to the tug to report his observations, Michael Smith had no reason to anticipate that the MARILYN was in peril. Sellers and the BETTY R were in the vicinity of the dredge and presumably would have reported any danger to Michael Smith. It was dark and the MARILYN was being towed 250 feet astern of the HAWK. Michael Smith had to shine his light on the dredge several times before he was able to observe the slight list. Some fifteen to twenty minutes later, Sellers came alongside and reported that the dredge was in danger of sinking.

---

1. This Court is satisfied that Michael Smith was in command of the towing operation and was responsible for navigational decisions. However, it was entirely reasonable for Smith to rely on information supplied by Roland Sell- ers who had a duty of warning Smith of observable danger to the tow. *Chitty v. M/V VALLEY VOYAGER*, 284 F.Supp. 297, 303–304 (E.D.La.1978), *aff'd* 408 F.2d 1354 (5th Cir. 1969).

Shebby further argues that the master of the HAWK, when he observed the tow in trouble, should have sought refuge in the nearby Honga River or should have taken the tow into shallow waters or should have immediately headed the tow into the wind or away from the wind to assure the safety of the dredge. However, the evidence indicates that when Michael Smith became aware that the dredge was in some difficulty, there was not enough time for any of these protective maneuvers. It was after 4:30 A.M. when Sellers and Major first brought to the attention of Michael Smith the fact that the dredge was in trouble. At that time, Michael Smith did slow down and head into the wind, following the directions of these employees of Shebby who had just been aboard the MARILYN and had noticed that it was taking on water. By that time, it was too late to save the Marilyn, which was then rapidly filling up with water. The sinking occurred around 5:00 A.M., and there was little that anyone could have done between 4:30 A.M. and 5:00 A.M. to save the imperiled dredge.

■ With the benefit of 20-20 hindsight and after the fact, Shebby has suggested many maneuvers which it claims would have prevented the sinking. But the test to be applied is not whether "it seems to us, who were not there, that another choice would have been better." *Frank Jacobus Transportation Co. v. Moran Towing & Transporation Co., Inc., supra* at 605, quoted with approval in *THE FRED SMARTLEY, Jr., supra* at 974. Only in case a master's conduct is outside the range of discretion of capable seamen may he be held for lack of seamanship. *Id.* at 974. As in *THE FRED SMARTLEY, Jr.*, the evidence presented in this case is insufficient to support a finding that the judgment of the master of the tug HAWK in doing what he did was outside the range of discretion properly allowed to him.

*In re Harris*, 216 F.Supp. 176 (E.D.La. 1963) likewise involved a contention that a master was negligent in slowing his vessel when he encountered heavy seas. In rejecting this argument, Judge Ainsworth found that the decision was one for the captain to make under all the circumstances and that a "mistake in judgment when viewed from the vantage point afforded by hindsight is not to be imputed as a fault." 216 F.Supp. at 180.

■ Shebby also points out that Michael Smith was not licensed as a tug master, as required by Coast Guard regulations.[2] This fact had little to do with the sinking of the MARILYN. Michael Smith was a seasoned waterman, knew the Bay well and had a good deal of experience in towing barges and other equipment belonging to Smith Bros. Frank Shebby knew that Smith Bros. could not furnish a licensed tug captain but was so anxious to start his Somerset County job that he readily agreed to have Michael Smith act as master of the tug.

### (b) *Unseaworthiness of the Tow*

■ On the record here, this Court further finds and concludes that the defendants in Civil No. H–77–1545 have proved by a preponderance of the evidence that the dredge MARILYN was unseaworthy at the time of this incident and that such unseaworthiness was the proximate cause of the sinking. The conditions encountered in the early morning hours of April 2 off the Hooper Islands were not unusual ones. The winds had increased to merely 10 to 15 knots and seas were no more than three to four feet. These were hardly storm conditions.[3] Since there has been no proof of improper handling and since conditions surrounding the sinking were not unusual, there is a presumption in this case that the dredge MARILYN was unseaworthy. *Valentine Waterways Corporation v. Tug CHOPTANK, supra.* In affirming the judgment entered by District Judge Hoffman in that case, the Fourth Circuit noted that the evidence had "elimi-

**2.** It should be noted that Roland Sellers, the master of the MARILYN, was likewise unlicensed.

**3.** In *THE FRED SMARTLEY, JR., supra*, winds of 18 to 20 miles an hour were found to be "not an unusual condition" but merely "a moderate breeze." 100 F.2d at 972.

nated every explanation for the breakup of [the] barge other than its own unfitness for an ocean voyage." *Valentine Waterways Corporation v. Tug CHOPTANK*, 380 F.2d 381, 382 (4th Cir. 1967). The same principle applies here. The only reasonable explanation for the MARILYN's sinking under weather conditions such as those which existed during the early morning hours of April 2 is that the dredge was unseaworthy because it was not watertight.

Even in the absence of the presumption applied in this case, the finding would be the same. The MARILYN was an old dredge built by Frank Shebby himself some twenty years earlier, with the help of a welder. It had sunk on two previous occasions, and on each of those two occasions, it had not even been under tow. The MARILYN had spent a good part of the winter of 1976–1977 locked in the ice at Joppatowne, Maryland. Sellers conceded that ice can damage the hull of a vessel like the MARILYN.

Frank Shebby admitted that following the tow from Joppatowne to Lowe's Wharf, he observed about two inches of water in the dredge, which he characterized as "nothing." When Sellers noticed the dredge listing around 4:30 A.M. on April 2 and took the BETTY R back for an inspection, he found four inches of water in the dredge. The evidence indicates that the MARILYN was not a tight vessel and that it in fact leaked during the tow down the Bay from Lowe's Wharf. The leaking increased as the wind picked up and as wave action heightened during the early morning hours of April 2. Under the circumstances here, this Court concludes that the owner of the dredge did not furnish a seaworthy vessel and cannot recover damages because of the sinking.

### III

#### The Claim in Civil No. H–77–1546

In Civil No. H–77–1546, Smith Bros. seeks to recover damages for services rendered under the towing contract. Shebby claims that it owes Smith Bros. nothing because the latter breached the agreement between the parties.

Little time need be spent in discussing this claim. An oral agreement was reached between Shebby and Smith Bros. whereby the latter was to furnish towing services. These services were duly and properly rendered, and the tow was terminated through no fault of Smith Bros. or its master. Shebby was properly billed for the amount agreed upon, computed at $45 per hour for the use of the tug and time and a half for the captain and the deckhand for overtime in excess of ten hours. This Court finds that Smith Bros. has proved that it is owed under this contract the sum of $1,931.82.

As discussed in Part II of this Opinion, Smith Bros. satisfactorily performed its part of the bargain in a workmanlike manner and exercised reasonable care in performing the services in question. There has been no proof here of a breach by Smith Bros. of the warranty of workmanlike performance which it owed to Shebby under the towing contract. *See Fairmont Shipping Corp. v. Chevron International Oil Company, Inc.,* 511 F.2d 1252, 1255 (2d Cir. 1975). Shebby is therefore responsible for payment of the bill rendered.

### IV

#### Conclusion

For the reasons stated, judgment is hereby entered in Civil No. H–77–1545 in favor of the defendants, with costs. Judgment is hereby entered in Civil No. H–77–1546 in favor of the plaintiff in the amount of $1,931.82, with costs.