**BRAZOSPORT TOWING COMPANY, INC., Plaintiff,**

v.

**DONJON MARINE CO., INC., Defendant.**

**Civ. A. No. G–81–144.**

United States District Court, S.D. Texas, Galveston Division.

Feb. 7, 1983.

---

L. Glen Kratochvil, Schirmeyer & Kratochvil, Houston, Tex., for plaintiff.

Bernard Ticer, Michael K. Bell, Clann & Pearson, Houston, Tex., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HUGH GIBSON, District Judge.

### I.

Trial of this case was held before the Court. The case involves plaintiff's claims that defendant owed plaintiff $20,300 for the oral charter hire of plaintiff's vessel, the NOAH SMITH, and a reasonable attorneys fee under article 2226 of the Revised Civil Statutes of Texas. This case was originally filed in state court and then removed to federal court. Having reviewed the testimony and the arguments of counsel, the Court is of the opinion that plaintiff has not shown by a preponderance of the evidence that it is due the amounts it seeks. Moreover, the Court holds that attorneys fees are not available. In accordance with rule 52(a) of the Federal Rules of Civil Procedure, the Court makes the following findings of fact and conclusions of law:

### II.

1. In January 1980, Donjon Marine Co. (Donjon) was supervising salvage operations on the BURMAH AGATE. Donjon's president is Arnold Witte.

2. Edward Dyer was, at all times relevant, president of Brazosport Towing Co., which operated a fleet of tugboats.

3. The first dealings between the parties concerned the charter of Brazosport's crew boat, the BEAR CAT, at $650 a day. Besides the BEAR CAT, Brazosport had chartered about seven vessels to parties other than Donjon working on the BURMAH AGATE. Dyer claims that on or about January 17 he called Witte to check on how his vessels were performing and also to advise that a tug, the NOAH SMITH, was available at a rate of $225 an hour.

4. Both parties testified that on or about January 19, 1980, they agreed to a chartering of the NOAH SMITH. Both parties envisioned that the tug would be used for towing a barge performing lightering services.

5. Donjon claims that Dyer called for the first time on the 19th and, after a discussion concerning the large amount of stand-by time involved, offered the NOAH SMITH at a rate of $200 for only those hours that Donjon actually used the vessel. Under Witte's version, the tug would travel from Freeport, Texas, to Galveston (a ten-hour trip) free of charge, and Donjon would not be under any obligation to use her when she arrived, although Witte stated that the tug would have been used for 10–12 hours a day, as he had with other tugs. Witte also understood that Dyer could seek to terminate the arrangement if Dyer found more profitable work for the tug. At the BURMAH AGATE site, Donjon had some vessels chartered under an "as used" agreement and named two tugboats.

6. According to Dyer, the parties agreed that Donjon would pay for the tug's services dock-to-dock. Moreover, Brazosport had reduced its customary price of $225 to $200 because Donjon would not use the tug after dark.

7. Dyer stated that Brazosport had never chartered out a vessel on an "as used" basis. His rates included daily, hourly, and dock-to-dock charges. Moreover, in light of the value of the vessel ($1,750,000) and the operational expenses ($500–600 a day for the crew and $120 an hour for fuel), the NOAH SMITH would not have been chartered on an "as used" basis.

8. After reaching their "agreement," the NOAH SMITH was dispatched to Gal-

veston and arrived the night of January 19. The vessel was actually used by Donjon on January 20 not to tow a barge but to take a group of people, including Witte, for an inspection trip of the BURMAH AGATE. During this trip Witte formed the opinion that the tug's master, Captain Mahaffey was incompetent because of the way he maneuvered the vessel from its dock and around the BURMAH AGATE. The next day the tug was used for 1½ hours to shift a barge from one pier to another. The NOAH SMITH was not used by Donjon thereafter. By January 23 the tug had left Galveston to tow a drilling rig, a job Dyer had contracted on the 23rd while the tug sat in Galveston.

9. Dyer claims that, after seeing that the tug was not being used and that demand for its use existed elsewhere, he asked Witte if the NOAH SMITH would be released so that it could be used fully on the drilling rig tow. Witte denies ever being asked by Dyer to terminate the charter and instead asserts that after the 23rd he was informed that the tug had left Galveston.

10. On January 31, 1980, Brazosport billed Donjon for 101½ hours of use of the NOAH SMITH, at a rate of $200 an hour (total: $20,300). The next communication between the parties occurred in August 1980, when Donjon complained of the tug's crew and proposed "payment commiserate (sic) with the services rendered." Plaintiff's exhibit # 3. Subsequently in December 1980, Dyer responded by setting out his version of the events (although not stating the contract terms) and disputing the allegations made against the crew. Plaintiff's exhibit # 4.

■ 11. In reaching its decision, the Court is faced with a credibility choice of two plausible versions of this contract. Because several questions arise in connection with plaintiff's version, the Court concludes that plaintiff has not proved its claim by a preponderance of the evidence.

First, in his testimony, Dyer stated his conclusions regarding the terms of the contract, without discussing the bargaining discussions leading up to it. In the context of an oral contract, the Court must determine the terms of the agreement from the conversation of the parties; no tangible evidence can be scrutinized. Plaintiff's bald assertions as to what the parties agreed provide the Court with little information about the contract formation.

Further, there was no work, except that in Galveston, for the NOAH SMITH until January 23 when Brazosport contracted the oil rig towage job. Although Dyer testified that demand for his vessel was high in 1980 and that he was negotiating for the oil rig job, there was no evidence that the tug could be used during January 19–23 in a job other than that in Galveston. The Court infers that Brazosport was willing to send the NOAH SMITH to Galveston as a stop-gap measure, in the hopes that it would be used for 10–12 hours a day.

Moreover, the Court notes that Brazosport did not make a vigorous demand for the $20,300 it alleges it is due. The parties did not testify to any communications between them from January to August. No additional invoices were sent to Donjon. The only other invoice was sent in December 1980 when Brazosport claimed it was owed interest on the $20,300. The Court is surprised by the lack of communication between the parties and infers that plaintiff was not seriously pursuing its claim.

Finally, plaintiff did not specify how the contract would be terminated. Thus, the alleged contract was apparently terminable at the will of either party. The Court is skeptical that Donjon would have left the NOAH SMITH sitting idly dockside at a rate of $200 an hour if the parties had agreed to the terms discussed by plaintiff, especially if Donjon was displeased with the tug's performance.

In light of these cloudy areas, the Court concludes that plaintiff has not shown that it is more likely than not that the parties agreed to and operated under the contract terms to which plaintiff testified.

■ 12. The Court does not find that the NOAH SMITH was unseaworthy. The vessel was fit for its intended purposes.

The vessel was intended to be used to tow a barge for lightering services. It had been used to tow other barges. Its crew was experienced and competent. Captain Mahaffey had been in the marine business for a number of years, had never presented any problems to Brazosport, and had a reputation for competence. Although Witte was not happy with Mahaffey's handling of the tug during the BURMAH AGATE inspection trip, the Court does not conclude that the vessel was unseaworthy. No damage was done as a result of the trip. The intended purpose of the vessel was to tow a barge, not to shuttle passengers to and from the BURMAH AGATE. Accordingly, the Court finds the NOAH SMITH seaworthy.

13. Having concluded that plaintiff did not prove its claim by a preponderance of the evidence and that the tug was seaworthy, the Court finds that Brazosport is due $200 an hour for the 5½ hours of work it performed on January 20 and 21. Because the parties agreed that the value of the NOAH SMITH's services was $200 an hour, whether the Court finds that the amount was due under defendant's interpretation of the contract or under a *quantum meruit* theory[1] is not necessary. Brazosport is due $1,100.

### III.

1. The Court has jurisdiction over this action. *See* 28 U.S.C. §§ 1332 & 1333.

2. The oral charter of the NOAH SMITH between Brazosport and Donjon is a marine contract. 1 Benedict, *On Admiralty* § 186 at 11–20 (1981). As such, it is subject to admiralty jurisdiction. *Id.* § 184, at 11–9. *See Kirno Hill Corp. v. Holt*, 618 F.2d 982, 984 n. 1 (2d Cir.1980); *Jack Neilson, Inc. v. Tug PEGGY*, 428 F.2d 54, 56–61 (5th Cir.1970), (per curiam) *cert. denied,* 401 U.S. 955, 91 S.Ct. 973, 28 L.Ed.2d 238 (1971). Falling within admiralty jurisdiction, the charter is subject to maritime law, even though the case was originally filed in state court and removed to this Court on the basis of this Court's diversity, as well as admiralty, jurisdiction. *See Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 628, 79 S.Ct. 406, 408, 3 L.Ed.2d 550 (1959); *Pope & Talbot, Inc. v. Hawn,* 346 U.S. 406, 410–11, 74 S.Ct. 202, 205–06, 98 L.Ed. 143 (1953); *Powell v. Offshore Navigation, Inc.,* 644 F.2d 1063, 1065 n. 5 (5th Cir.) *cert. denied,* 454 U.S. 972, 102 S.Ct. 521, 70 L.Ed.2d 391 (1981); *Carlson v. Palmer,* 472 F.Supp. 396, 398 (D.Del.1979).

3. Brazosport was responsible for making sure the NOAH SMITH was in a seaworthy condition. *See Horn v. Cia de Navegacion Fruco, S.A.,* 404 F.2d 422, 428 (5th Cir.1968), *cert. denied,* 394 U.S. 943, 89 S.Ct. 1272, 22 L.Ed.2d 477 (1969). The burden of showing that the tug was unseaworthy rested with Donjon. *See Shebby Dredging Co. v. Smith Brothers, Inc.,* 469 F.Supp. 1279, 1284 (D.Md.1979). The Court finds that Donjon has not carried that burden.

4. The Court concludes that plaintiff has not sustained its burden in showing that an oral charter existed on the terms alleged by plaintiff. However, the Court finds that plaintiff is due $1,100 for the work it performed on January 20 and 21.

5. Prejudgment interest is the rule rather than the exception in admiralty. *Mecom v. Levingston Shipbuilding Co.,* 622 F.2d 1209, 1217 (5th Cir.1980). Having found that exceptional circumstances do not exist in this case, the Court finds that plaintiff is due prejudgment interest of 9% from January 31, 1980, the date plaintiff made demand of defendant.

6. Having concluded that plaintiff shall recover against defendant, although for a smaller amount than that originally sought, the Court notes that plaintiff apparently has satisfied the state law prerequisites of article 2226 of the Texas Civil Statutes,

---

1. One possible theory, not proposed by either party, is that the parties did not come to an agreement. Instead, each operated under the belief that his version of the contract was the one controlling the parties. Without agreeing on the terms, the parties did not form a contract. Plaintiff's remedy would be on a *quantum meruit* or quasi contract theory.

under which plaintiff claims attorneys fees. Tex.Rev.Ann.Civ.Stat. art. 2226 (Vernon's Supp. 1982–83). *See Elizabeth-Perkins, Inc. v. Morgan Express, Inc.,* 554 S.W.2d 216, 219 (Tex.Civ.App.—Dallas 1977); *Barcheers v. Braswell,* 548 S.W.2d 76, 79 (Tex.Civ.App. —El Paso 1977); *McDaniel v. Tucker,* 520 S.W.2d 543, 548 (Tex.Civ.App.—Corpus Christi 1975).[2]

7. However, the Court concludes that Brazosport may not recover its attorneys fees via state law in this maritime action. Plaintiff argues that availability of attorneys fees would provide a nonconflicting additional remedy supplementary to the general maritime law. *See* 1 Benedict, *On Admiralty* § 127 at 8–45 (1981) ("a state may sometimes supplement maritime policies"). As authority, plaintiff relies on *Allen v. The M/V CONTESSA,* 196 F.Supp. 649, 651–52 (S.D.Tex.1961), in which the court held that as part of a maritime lien claim (46 U.S.C. § 971) a plaintiff could recover attorneys fees under art. 2226 as against the owner of the vessel *in personam.*

8. This Court declines to follow *Allen* and holds that the recovery of attorneys fees in this action would "redefin[e] the requirements or limits of a remedy available at admiralty." *Powell, supra* at 1065 n. 5 (citations omitted). Absent federal statutory authority or other exceptional circumstances, *see Noritake Co. v. M/V HELLENIC CHAMPION,* 627 F.2d 724, 730–31 & n. 5 (5th Cir.1980), attorneys fees may not be recovered in admiralty cases. The facts in this case do not fall within the exceptions to the rule. Decisions after *Allen* have refused to allow attorneys fees claimed under art. 2226. *Compania Anonima Venezolana de Navegacion v. A.G. Solar & Co.,* 1977 A.M.C. 1786, 1789 (S.D.Tex.1977) (shipper liable to carrier for freight); *Crispin Co. v. M/V KOREA,* 251 F.Supp. 878 (S.D.Tex. 1965) (cargo damage case). Moreover, the Court notes that the Alaska district court has refused to allow the recovery of attorneys fees in admiralty actions when asserted under Alaskan law. *Kalmbach, Inc. v. Insurance Co. of the State of Pennsylvania,* 422 F.Supp. 44 (D.Alaska 1976) (marine insurance coverage). *Accord Mitchell v. Alaska Packers Association,* 1982 A.M.C. 2796 (D.Alaska 1981); *City of Homer v. Crowley Maritime Corp.,* 1978 A.M.C. 2006 (D.Alaska 1978). *See also Gradmann & Holler GMBH v. Continental Lines,* 679 F.2d 272, 273–74 (1st Cir.1982) (local Puerto Rican rule allowing attorneys fees not applicable to maritime action) (citing *American Union Transport Co. v. Aguadilla Terminal, Inc.,* 302 F.2d 394, 396 (1st Cir.1962)). *Cf. Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). On the basis of these authorities, the Court is persuaded that the recovery of attorneys fees in this case would interfere with the uniformity of maritime law. *See Romero v. International Terminal Operating Co.,* 358 U.S. 354, 373, 79 S.Ct. 468, 480, 3 L.Ed.2d 769 (1959).[3]

7. In sum, the Court concludes that plaintiff shall recover from defendant $1,100 with prejudgment interest of 9% from January 31, 1980.

8. If any of the foregoing findings of fact constitute conclusions of law, they are adopted as such. If any of the foregoing conclusions of law constitute findings of fact, they are adopted as such.

---

2. The parties have not contested this point.

3. The Court notes that the Fifth Circuit on two occasions has addressed but never decided this issue. *See Noritake Co. v. M/V HELLENIC CHAMPION,* 627 F.2d 724, 731 (5th Cir.1980); *In re Dearborn Marine Service, Inc.,* 499 F.2d 263, 288 (5th Cir.1974), *cert. dismissed,* 423 U.S. 886, 96 S.Ct. 163, 46 L.Ed.2d 118 (1975).