### In re COASTAL CARRIERS CORPORATION, Debtor.

**Bankruptcy No. 89–5–0520–JS.**

United States Bankruptcy Court, D. Maryland.

June 3, 1991.

Richard L. Wasserman, David E. Rice, John A. Roberts, Venable, Baetjer & Howard, Baltimore, Md., for debtor.

Gary R. Greenblatt, Schwarz & Greenblatt, Baltimore, Md., Robert H. Brownlee, St. Louis, Mo., Gerald D. Stoltz, Thompson & Mitchell, Washington, D.C., for Hornbeck Offshore Services, Inc.

David W. Skeen, Wright, Constable & Skeen, Baltimore, Md., for Creditors' Committee.

Edmund A. Goldberg, Office of the U.S. Trustee, Baltimore, Md.

## MEMORANDUM OPINION OVERRULING OBJECTION TO ADMINISTRATIVE CLAIM

JAMES F. SCHNEIDER, Bankruptcy Judge.

The issue presented in this case is whether the owners of a tug which towed the debtor's barge three-quarters of the way

across the Atlantic Ocean before the barge sank (through no apparent fault of the tug) are entitled to an administrative expense claim against the debtor's bankruptcy estate based upon a postpetition towage contract. For the reasons stated, this Court concludes that the administrative claim should be allowed.

FINDINGS OF FACT

1. Coastal Carriers Corporation, a Florida corporation, filed a voluntary Chapter 11 bankruptcy petition in this Court on February 16, 1989. The debtor-in-possession was engaged in the business of shipping freight in its ocean-going barge, *PRODUCER*.

2. On November 16, 1989, Coastal Carriers Corporation entered into an agreement with the embassy of the Republic of Tunisia whereby the debtor-in-possession agreed to load its barge, the *PRODUCER*, with wheat for delivery from California to ports in Tunisia.

3. On December 4, 1989, the debtor-in-possession and Hornbeck Offshore Services, Inc. ["Services"] entered into a contract entitled "Standard Towage Agreement" which provided for the time charter of the tug *GOLIATH* for the purpose of towing the debtor's barge *PRODUCER* with its cargo of wheat from California to Tunisia.

4. The contract provided that the debtor was obligated to pay the tug owner [Services] "$3,800 per day plus fuel," payable semi-monthly in advance for the duration of the time charter for about 50–120 days. Agreement, paragraph 4.

5. On December 9, 1989, the tug *GOLIATH* sailed from Morgan City, Louisiana via the Panama Canal to Sacramento, California where it met the *PRODUCER*, which was loaded with 18,000 metric tons of wheat. It took the *PRODUCER* in tow on December 26, 1989 and sailed through the Panama Canal and across the Atlantic Ocean bound for its destination of Sfax, Tunisia on the Mediterranean coast of North Africa.

6. The tug and its tow encountered rough weather for most of the voyage. On the morning of February 25, 1990, the barge *PRODUCER* was observed by the crew of the tug *GOLIATH* to be listing five degrees on the port side. The list increased to ten degrees by the afternoon of March 1, 1990. It was not possible for crew members from the *GOLIATH* to board the *PRODUCER* because of rough seas. Because of the weather conditions, the barge could not even be seen from the tug. On March 3, 1990, the tow line was cut and the *PRODUCER* presumably capsized and sank two days later at a point in the Atlantic Ocean approximately 180 miles west of the island of Madeira.

7. On August 27, 1990, Hornbeck Offshore Services, Inc., the owner of the tug *GOLIATH*, and Hornbeck Offshore Operators, Inc. ["Operators"], a subsidiary of Services and the operator of the tug *GOLIATH* filed a motion for allowance and payment of administrative claim [P. 136] in the total amount of $284,404.35 incurred as a result of the abortive trans-oceanic towage of the debtor's ill-fated barge.

8. The claim of $284,404.35 is itemized as follows:

| | | |
|---|---|---|
| (a) | Balance of charter hire payments | $116,449.05 |
| (b) | Diesel fuel supplied at Sacramento, California and Balboa, Panama by Marine Fuels | 134,111.28 |
| (c) | Diesel fuel supplied at St. Eustatius, Netherlands Antilles, by Statia Terminals | 33,844.02 |

9. The debtor did not pay for any of the fuel supplied for the voyage. Operators paid the fuel suppliers to prevent the arrest of the tug *GOLIATH* and claims to be entitled to reimbursement from the debtor under the terms of the towage contract.

10. On September 17, 1990, the Unsecured Creditors' Committee filed an objection [P. 140] to Hornbeck's motion for allowance and payment of administrative claim. As grounds for its objection, the Committee claimed that (1) the tug owner and operator "may not recover tug hire in instances where the contracted-for voyage has not been completed or the tow has been lost through negligence or breach of war-

ranty on the part of the tug" and (2) that the Committee "objects to the payment of the balance due on tug hire and fuel expenses until it has had an opportunity to review the investigative materials and determine whether the tug owners and operators have an entitlement to tug hire under the circumstances." Objection [P. 140], paragraphs 3 and 4. The debtor-in-possession did not object to the claim and has consented to the granting of Hornbeck's administrative claim.

11. A hearing was held on the motion and the objection on December 12, 1990. As a result of that hearing and a thorough review of all papers filed in the record of this case, the objection will be overruled and the administrative claim will be allowed.

CONCLUSIONS OF LAW

■ 1. A motion for allowance and payment of an administrative claim is a core proceeding which a bankruptcy judge may hear and determine. 28 U.S.C. § 157(b)(2)(A) and (B) (1988).

2. The allowance of administrative expense claims is governed by Section 503 of the Bankruptcy Code, which provides in relevant part:

§ 503. Allowance of administrative expenses.

(a) An entity may file a request for payments of an administrative expense.

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—

(1)(A) The actual, necessary costs and expenses of preserving the estate, including wages, salaries or commissions for services rendered after the commencement of the case[.]

11 U.S.C. § 503(a), (b)(1)(A) (1988).

3. The purpose of Section 503 is to permit the debtor's business to operate for the benefit of its prepetition creditors. In order to effectuate a successful reorganization, third parties must be willing to furnish postpetition goods or services on credit. Third parties might refuse to extend credit to debtors-in-possession for fear that their claims would not be paid, but an advance payment requirement would impede the debtor's business. Section 503 requires that such claims be given priority, therefore inducing third parties to extend credit and enhancing the likelihood of a successful reorganization. *In re Jartran, Inc.*, 732 F.2d 584 (7th Cir.1984).

4. A two-part test has been established to determine administrative priority. The debt must both (1) arise from a transaction with the debtor-in-possession and (2) be beneficial to the debtor-in-possession in the operation of the business. *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir.1976).

5. The opinion of Bankruptcy Judge Robert D. Martin in the case of *Matter of Patch Graphics*, 58 B.R. 743 (Bankr.W.D. Wis.1986) contains the following excellent exposition regarding the allowance of administrative claims in the context of the instant case:

... A court must consider two main factors in deciding whether to allow an administrative expense. First the expense in question must be shown to have been "actual and necessary." Second, the expense must not have been incurred primarily in the interest of the claimant, and must in fact have benefitted the estate and creditors as a whole.

The principle of allowing administrative expenses in bankruptcy cases has a long history dating back to the Bankruptcy Act of 1867. *See* 3 *Collier on Bankruptcy* § 503.03 at 503–10 et seq. (15th ed. 1985). Section 503(b)(1)(A) is drawn from section 64 of the Bankruptcy Act, former 11 U.S.C. § 104, which provided in relevant part that "the costs and expenses of administration, including the actual and necessary costs and expenses of preserving the estate subsequent to filing the petition" are entitled to first priority. *In re Prime, Inc.*, 37 B.R. 897, 898 (Bankr.W.D.Mo.1984) (quoting former 11 U.S.C. § 104). The *Prime* opinion cites a leading Supreme Court case for the proposition that "the words preserving the estate include the larger objective, common to arrangements, of operating the debtor's business with a view

to rehabilitating [it]." *Id. quoting Reading Company v. Brown*, 391 U.S. 471, 475, 88 S.Ct. 1759, 1762, 20 L.Ed.2d 751 (1968). The costs and expenses of preserving an estate are not restricted to the categories specified in section 503 but include other necessary costs and expenses incurred in running a business during the pendency of a chapter 11 case. *Prime*, 37 B.R. at 898.

58 B.R. at 745.

■ 6. The postpetition towage contract in the instant case, entered into incident to the debtor's business and in its ordinary course, gave rise to an administrative expense, according to the foregoing exposition. Services rendered under the contract were actual and necessary, enabling the debtor's business of owning and operating an ocean-going barge to function during the pendency of its Chapter 11 bankruptcy case.

■ 7. The sinking of the barge did not lessen the entitlement of Hornbeck to an administrative claim. Despite the loss of the *PRODUCER* and the debtor's attendant inability to complete its contract to deliver wheat to Tunisia, the debtor's estate was benefited in a number of respects. The principal benefit was the ability of the debtor's business to function as a going concern. The means afforded the debtor of having the ability to enter into a commercial shipping contract, which even though not fully performed, gave rise to certain claims and causes of action on behalf of the estate. Ironically, one such claim is that of the debtor against the debtor's insurer for the loss of the barge. There may be other claims against the governments of both Tunisia and the United States based upon various theories.

■ 8. The Creditors' Committee erroneously asserts that there is a presumption of negligence on the part of a tug which arises whenever there occurs the unexplained sinking of a vessel being towed. In the instant case, it asserts that Hornbeck has failed to rebut the presumption that its negligence caused the sinking of the *PRODUCER.*

There is no such presumption of fault or negligence on the part of a tug which arises solely because of the loss of a vessel being towed. As District Judge Harvey stated in the case of *Shebby Dredging Co. v. Smith Bros., Inc.*, 469 F.Supp. 1279 (D.Md.1979):

The principles of law to be applied in determining liability for a loss occurring under a towage contract are well known. In general, the owner of the tow is responsible for its seaworthiness and the owner of the tug for its safe navigation. *Curtis Bay Towing Co. v. Southern Lighterage Corp.*, 200 F.2d 33, 34 (4th Cir.1952); *THE LIZZIE M. WALTER*, 3 F.2d 921 (4th Cir.1925); *THE RADNOR*, 21 F.2d 982 (D.Md.1927). However, the owner of the tug is not an insurer, and the mere loss of the tow raises no presumption of fault. *Stevens v. THE WHITE CITY*, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932); *Curtis Bay Towing Co. v. Southern Lighterage Corp, supra* at 34. Thus, the mere happening of an accident does not raise any presumption of fault or negligence on the part of the tug. *Southgate v. Eastern Transp. Co.*, 21 F.2d 47 (4th Cir.1927); *Valentine Waterways Corporation v. Tug CHOPTANK*, 260 F.Supp. 210 (E.D.Va.1966), *aff'd* 380 F.2d 381, 382 (4th Cir.1967).

469 F.Supp. at 1283.

■ 9. The filing by Hornbeck of a claim is *prima facie* evidence of the validity and amount of the claim itself. Bankruptcy Rule 3001(f). As to whether the claim is administrative in nature, that is, whether this postpetition claim is for services rendered which were "actual, necessary costs and expenses of preserving the estate," Hornbeck, as the applicant, bears the burden of proof on the issue of whether the claim is entitled to administrative priority. The Court finds that it has met its burden.

■ 10. The Committee's objection only incidentally challenges the administrative character of the claim by objecting to its immediate payment. Because the Committee is really objecting to the validity of the claim itself, the burden of producing evi-

dence contradicting the claim has shifted to the Committee as objector. *In re Friedman*, 436 F.Supp. 234, 236–37 (D.Md.1977).

■ 11. The burden has shifted to the objector to show that Hornbeck's negligence caused the *PRODUCER* to sink. In *Stevens v. THE WHITE CITY*, cited *supra*, the Supreme Court held that the operator of a tug had "the duty to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of a similar service." 285 U.S. at 202, 52 S.Ct. at 350. In the instant case, there is no evidence that the operators of the tug failed to exercise such care and skill. The basis of the Committee's objection is its suspicion that Hornbeck was somehow at fault. All the evidence on file is to the contrary.

12. The objector has failed to produce any evidence to contradict the claim of Hornbeck.

13. At the hearing in this matter, the Creditors' Committee withdrew its objections to Hornbeck's claim for fuel costs which it advanced and for the reimbursement of which it was clearly entitled under the contract which obligated the debtor to purchase fuel for the tug *GOLIATH.*

14. The owners and operators of the tug are entitled to be paid to the point of the return of the tug *GOLIATH* to its home port, according to the terms of the contract.

For all the reasons stated, the objection of the Creditors' Committee will be overruled and Hornbeck will be allowed an administrative claim in the amount of $284,-404.35.

ORDER ACCORDINGLY.